MARGARET L. CARPENTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63129. Filed June 6, 1960.

---

[1] The contributions do not include any interest.

*James Park, Esq.*, for the petitioner.
*Hubert E. Kelly, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency of $124,647.02 in petitioner's income tax for the year 1953. The sole issue is whether petitioner constructively received the proceeds from the sale of certain stock in such year.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

The petitioner and her husband, A. H. Carpenter (hereinafter referred to as A. H.), are residents of Clark County, Kentucky, and resided there at all times hereinafter mentioned. Petitioner filed an individual income tax return for 1953 on the cash receipts and disbursements basis with the district director of internal revenue at Louisville, Kentucky.

A. H. has been engaged in the oil business as an oil producer for many years. Until August 4, 1953, and for many years prior thereto, A. H. was the principal managing officer of South Central Petroleum Corporation (hereinafter referred to as Central), a Kentucky corporation engaged in the business of exploring for and the production of crude oil and gas.

At all relevant times Central had issued and outstanding 330 shares of capital stock which until August 4, 1953, were owned as follows:

| *Stockholder* | *Number of shares* |
| --- | --- |
| Petitioner | 82 |
| A. H. | 83 |
| Estate of E. Arthur Ball | 165 |

Petitioner had purchased her 82 shares of Central stock on February 17, 1948, from James F. Frenzell for $18,000 under an installment contract, which provided for a downpayment of $2,000 and monthly installments of $1,000 each thereafter. At the time petitioner contracted to purchase the Central stock, she did not have sufficient funds to pay the purchase price, and A. H. agreed with her to advance them. For this purpose he loaned petitioner about $10,000, by paying the downpayment and a number of subsequent installments as they came due.

On August 4, 1948, A. H. gave petitioner an undivided one-half interest in a producing oil lease [1] and with income from this source

---

[1] Petitioner's ownership of this lease has never been contested.

she began paying the installments due on her purchase of the Central stock and she also began repaying A. H. Ultimately she repaid A. H. all of the money which he had loaned her, and also paid off the balance of the installments to Frenzell.

In 1953, the California Company of New Orleans, Louisiana (hereinafter called California), became interested in Central and on June 19, 1953, made a written offer to A. H., petitioner, and the estate of E. Arthur Ball (hereinafter referred to as Ball) for the purchase of all of its outstanding stock (together with certain lands and leases owned by A. H. and Ball) for the sum of $2,035,000. On June 27, 1953, California amended its offer in respects not relevant to this case and on this same date A. H., petitioner, and Ball accepted such amended offer.

On July 22, 1953, a supplemental agreement was entered into between California on the one hand, and A. H., petitioner, and Ball on the other, whereby the time for closing was extended up to and including August 4, 1953.

Commencing on June 18, 1953, and before August 4, 1953, 14 suits were filed in the United States District Court for the Eastern District of Kentucky at Lexington, Kentucky, wherein petitioner and A. H. were parties defendant. Central was a party defendant in 8 such suits. All of these suits alleged that false and fraudulent misrepresentations on the part of A. H. had induced the plaintiffs to make investments in oil and gas leases, and commencing with the second suit, which was filed on July 3, 1953, it was alleged that petitioner's 82 shares of Central stock had actually been purchased by A. H. and transferred to her for the fraudulent purpose of hindering, cheating, and defrauding his creditors, and praying therefore that such transfer be canceled, set aside, and held for naught.

The prayers of these suits aggregate $534,609.50. California was informed and had knowledge of these suits soon after the respective dates on which each was filed and was also informed and believed that additional such suits would be filed. Within less than a year, 12 such additional suits were filed.

The defendants have contested all of these suits by appropriate pleadings and answers, but at the time of trial of this case all 26 were still pending undisposed of save one in which judgment was entered for defendants in August 1956 and affirmed in October 1957 under the style *Terrill* v. *Carpenter*, 249 F. 2d 142.

The officials of California discussed the dangers of the pending and potential suits with its corporate counsel and attorneys in New Orleans and Lexington and were advised that the purchase of Central's stock should not be completed unless petitioner would agree that California could withhold that part of the total contract price

attributable to her Central stock, pending the outcome of the suits. Consequently, on July 31, 1953, they met with A. H., petitioner, their attorney, and the representatives of the Ball estate at A. H.'s office in Winchester, Kentucky, to discuss the closing of the transaction in question. Dee Davis, one of California's vice presidents and its principal representative at this conference, told petitioner and A. H. that California was aware of the suits, and that before it would close the transaction for the purchase of Central's stock petitioner would have to agree to allow California to withhold that part of the contract price attributable to her 82 shares of said stock. Petitioner's attorney objected to this proposition, but Davis told him that California would not complete the purchase unless this was agreed to. Davis asked petitioner and A. H. to consider California's proposition, and left with petitioner a draft of a proposed agreement setting forth California's proposition.

After this conference, petitioner, A. H., and their attorney, together with representatives of the Ball estate, discussed the proposition made by California, and they all believed that unless it was accepted the entire transaction would fall through.

Petitioner felt that the 82 shares of Central stock belonged to her and that eventually she would be paid. She was not aware of how involved and time consuming the lawsuits would be, and in order that the sale could be completed, she agreed to accept the terms set down by California.

On August 3, 1953, Davis and other representatives of California again met with A. H., petitioner, their attorney, and the representatives of the Ball estate at A. H.'s office. Davis presented what purported to be a final draft of an agreement permitting California to withhold the petitioner's portion of the sales price attributable to her Central stock, and petitioner's attorney then proposed that the amount attributable to the petitioner's stock be placed in escrow in order that the money could be invested in Government bonds and draw interest. While Davis recognized that escrowing the money was the normal procedure, he did not want to agree to this because he felt that such a procedure was too much trouble. Davis suggested that petitioner allow California to owe her the money on open account and agree to pay her 2 per cent interest on the amount withheld. This suggestion was satisfactory to petitioner, and she thereupon verbally agreed to it.

On August 4, 1953, the same group again met in the board room of the First National Bank in Lexington for the purpose of closing. At that time petitioner and California entered into the following supplemental agreement (hereinafter referred to as the supplemental agreement):

Winchester, Kentucky
*August 4, 1953*

Mrs. Margaret L. Carpenter,
*Winchester,*
*Kentucky.*

Dear Mrs. Carpenter:

Under the provisions of our letters to you, Mr. A. H. Carpenter and the Estate of E. Arthur Ball, dated June 19, 1953 and June 27, 1953, we agreed to purchase all of the outstanding stock of the South Central Petroleum Corporation, a Kentucky corporation, in which you, Mr. Carpenter and the Estate of E. Arthur Ball are the sole stockholders.

After your acceptance of the proposals embodied in our letters to you, dated June 19, 1953 and June 27, 1953, a number of lawsuits have been filed in the District Court of the United States for the Eastern District of Kentucky, in which various plaintiffs seek judgments against you and your husband, A. H. Carpenter, in amounts aggregating Four Hundred and Twenty Nine Thousand, Eight Hundred and Fifty Nine and 50/100 Dollars. Said actions are Actions Nos. 1028, 1033, 1034, 1035, 1036, 1037, 1038, 1039, 1043, 1044, 1045, 1046, 1047 and 1048 in said Court. In each of such actions the plaintiffs contend that the stock of the South Central Petroleum Corporation now standing in your name on the books of the company was paid for by your husband, A. H. Carpenter, and was caused to be transferred to you for the fraudulent purpose of hindering, cheating and defrauding his creditors. You understand that we have knowledge, of course, of the pendency of said lawsuits.

We, therefore, propose to withhold from the total purchase price required by us to be paid under our letters of June 19, 1953 and June 27, 1953, the sum of Four Hundred and Ninety Seven Thousand Four Hundred and Eleven and 62/100 ($497,411.62) Dollars, which said sum represents the portion of the total purchase price fairly allocable to the value of the eighty two (82) shares of stock of the South Central Petroleum Corporation presently standing in your name upon the books of the company.

We are holding this sum under the following conditions:

1. If all of the foregoing lawsuits are dismissed with prejudice to the plaintiffs (as a result of a compromise, or by final judgment binding upon the plaintiffs, or otherwise), we will pay the sum withheld to you upon your request, provided no new lawsuits for money judgments have been filed against Mr. A. H. Carpenter arising out of transactions occurring before August 4, 1953.

2. If all of the foregoing lawsuits are decided adversely to Mr. A. H. Carpenter and you, or adversely to Mr. A. H. Carpenter alone, and the aggregate amount of the adverse judgments are [*sic*] paid in full by Mr. A. H. Carpenter or you or both, we will pay the sum withheld to you upon your request, provided that, prior to your request for payment, no new lawsuits for money judgments have been filed against Mr. A. H. Carpenter arising out of transactions occurring before August 4, 1953.

3. If during the period we are holding the sum allocable to your stock, any new lawsuits for money judgments are filed against Mr. A. H. Carpenter arising out of transactions occurring before August 4, 1953, we may hold such sum until such lawsuits are dismissed with prejudice to the plaintiffs or until any judgment rendered therein adverse to you or to Mr. A. H. Carpenter is paid in full.

4. Each of the three foregoing conditions is subject to the following provisions: If the Court in the foregoing lawsuits at any time shall determine affirmatively and explicitly as against all of the plaintiffs in such suits, that

your acquisition of stock in South Central Petroleum Corporation was not fraudulent, as alleged by such plaintiffs, and that credits [sic] of Mr. A. H. Carpenter have no right to subject such stock to process for the payment of Mr. A. H. Carpenter's obligations, we will forthwith pay to you the sum withheld.

The California Company will pay two per cent (2%) per annum on the money so withheld, interest payable to you semi-annually.

If the above provisions are acceptable to you, please indicate your concurrence by signing the duplicate copy of this letter.

Very truly yours,

THE CALIFORNIA COMPANY
BY K. H. Shaffer (s)
BY Dee Davis (s)

Accepted and agreed,
this 4th day of August, 1953.
Margaret L. Carpenter (s)

After executing the supplemental agreement, the sellers transferred to California all their Central stock, and A. H. and Ball transferred the other requisite properties and A. H. and Ball were paid by California.

In accordance with the terms of the supplemental agreement California paid petitioner nothing and set up an open account of $497,411.62 on its books representing the agreed amount allocable to her 82 shares of Central. Petitioner and respondent have now stipulated that $497,411.62 represents the portion of the total contract price fairly allocable to petitioner's 82 shares of Central. California has paid petitioner the agreed 2 per cent interest on the amount each year.

During 1958 California's Kentucky counsel reviewed the situation with respect to the 25 cases still pending against A. H. and petitioner, and studied the testimony in certain of these cases which had been tried but not yet decided. As a result California made a payment of $200,000 to petitioner out of the withheld funds.

During 1953, petitioner did not have the unqualified right to demand the proceeds from the sale of her Central stock and did not actually or constructively receive said proceeds.

### OPINION.

In his statutory deficiency notice, the respondent stated:

It has been determined that sale of [your] 82 shares of stock * * * constituted a *completed transaction* in 1953 * * *

*       *       *       *       *       *       *

On August 4, 1953, you entered into a *voluntary agreement* with The California Co., to the effect that your share of the sales price, $479,411.62, would be withheld pending settlement of certain suits which had been filed. It is held that this agreement constituted *constructive receipt* of the sale price of the stock, and that the recognized gain is includible in income for the year 1953. [Emphasis added.]

On brief, respondent states his position as follows:

The transaction was *completed and closed in 1953*. All incidents of the petitioner's ownership in her Central stock passed to California at that time, and it became *unconditionally* obligated to pay the purchase price. Moreover, *all* economic benefits of the withheld funds inured solely to petitioner's benefit, which is evidenced by the interest paid the petitioner by California. The petitioner *voluntarily* agreed to allow California to withhold her proceeds to protect it from any defect in her title. She did so because she was confident of her ownership of the stock and because she, [A. H.] and the Ball Estate wanted the sale to be consummated. The fact that California held the proceeds is not a disturbing factor. In substance, the withholding agreement is the *equivalent of payment to the petitioner and a voluntary redeposit*. Thus, it follows that a long term gain from the sale of the Central stock was realized by the petitioner in 1953, as determined by the respondent. [Emphasis added.]

Respondent thus argues that the agreement of August 4, 1953, was *voluntary* on petitioner's part, and amounted to and proved a *constructive receipt* of sale proceeds by her, thus *completing* the entire transaction since California was *unconditionally* obligated to pay on receipt of her 82 shares, and *all* economic benefits of the withheld funds inured to petitioner's benefit.

The facts in this case are almost entirely undisputed, and that being so, the mere statement of respondent's position demonstrates that it is entirely untenable.

We consider first whether petitioner's agreement of August 4, 1953, was in fact voluntary. It is hard to imagine a more inaccurate statement. Thirteen newly filed lawsuits questioning her title were pending, California had notice of them, and even respondent states (in a proposed finding of fact):

The petitioner * * * recognized that the amount offered by California was a good price * * * and that if she did not agree to allow it to withhold the proceeds attributable to her stock, the transaction would not be closed. * * * Therefore, in order that the sale could be completed, she agreed to accept the terms set down by California for the closing of the sale. * * *

What would have resulted if petitioner had adamantly demanded cash on August 4, 1953? We can certainly assume that the original agreement required her to convey good title to her 82 shares. It seems certain that the entire deal would have fallen through. There can be little doubt of this in the light of the law of Kentucky which tests the innocence of a third party purchaser for value by his knowledge at the time he pays the consideration rather than at the time the contract for sale was made. This under section 378.010, Ky. Rev. Stat., which provides that fraudulent assignments are void as against the one defrauded, but excepts subsequent purchasers for value, without notice. *International Shoe Co.* v. *Bowling*, 201 Ky. 690, 258 S.W. 113.

Respondent argues that California was unconditionally obligated to pay when petitioner conveyed to it all her incidents of ownership

in the 82 shares. To such bald misstatement we simply refer to the supplemental agreement of August 4, 1953, which we have set out in full in the findings.

Respondent next argues that *all* economic benefit of the withheld funds inured solely to petitioner's benefit, but points only to the fact that California has paid 2 per cent interest on the withheld funds. The complete answer to this argument lies in the facts of this case which show the degree of petitioner's domination and control. Cf. *Marion H. McArdle*, 11 T.C. 961; *Preston R. Bassett*, 33 B.T.A. 182, affd. 90 F. 2d 1004; *North American Oil* v. *Burnet*, 286 U.S. 417. Petitioner received a conditional open account;[2] an unsecured debt security bearing 2 per cent interest; and we do not believe she could have gotten anything more favorable. She could not, for example, consume principal, convert to a tax-free debt security or to an equity security, all of which things are often desirable. In *Howard Veit*, 8 T.C. 809, obligor paid interest on the funds there withheld, and we considered this, along with other facts at least no less favorable to respondent than those in the instant case. Our conclusion there, as here, was and is against respondent.

The remainder of respondent's argument is that this entire transaction was completed in 1953, and that petitioner, therefore, con-

---

[2] California's position, and its handling of this account is best demonstrated by the testimony of its vice president:

"Q. What did you say to them on that occasion as representing the position of the California Company?

A. I told them that we had examined their affairs * * * and in accordance with the terms of the offer we made them and in accordance with the developments in these lawsuits, that we were prepared to show them how much of that $2,035,000 we were willing to pay them at that time.

I went right down the line, telling them what we were going to hold out, and what we wanted, and so on and told them that was the basis that we were ready to settle on.

\* \* \* \* \* \* \*

I told them that we felt we would have to hold that out [payment for petitioner's stock] in order to protect the California Company against a possible duplicate payment.

\* \* \* \* \* \* \*

Q. State whether or not that agreement was verbally agreed to on Monday, the third day of August, 1953.

A. It was, let me put it this way.

We were led to believe that our offer and the conditions were satisfactory and for us to go ahead and make the arrangements with the bank and get the money and get everything set, on the appointed hour everything would go through. That is the understanding I had.

Q. I will ask you a little about this 497,000-some-odd dollars that was withheld representing Mrs. Carpenter's share of the purchase price or her stock, rather.

How was that handled by the California Company subsequent to that date? Was it invested in any securities or segregated in any way in the assets of the California Company?

A. No, sir.

\* \* \* \* \* \* \*

Q. Now, when the funds were withheld belonging to Mrs. Carpenter, how were they treated as far as the California Company was concerned?

A. We set them up in our records, as $495,000-some-odd due Mrs. Margaret L. Carpenter, or someone when these lawsuits were settled."

structively received the withheld funds. If the transaction had been completed it would follow that nothing remained to be done but for petitioner to receive the proceeds of sale at the appointed time. But here, if the pending lawsuits were not somehow cleared, the appointed time would never come.

We could only be justified in holding constructive receipt on the facts of this case on a finding that the agreements between petitioner and California of August 3 and 4, 1953, were mere subterfuge and sham so that petitioner could postpone her income tax to another year. Respondent does not contend for such a finding and we are convinced that the dealings between petitioner and California were arm's length, *Howard Veit*, *supra*, and were the best deal that petitioner was able to make under the circumstances.

*Decision will be entered under Rule 50.*