William O. Anderson and Glenna Anderson v. Commissioner. J. Irving Anderson and Grace H. Anderson v. Commissioner.
Anderson v. Commissioner
Docket Nos. 79669, 79670.
United States Tax Court
T.C. Memo 1961-139; 1961 Tax Ct. Memo LEXIS 213; 20 T.C.M. (CCH) 697; T.C.M. (RIA) 61139; May 17, 1961
*213 Held, that that part of the profit from the sale of stock and other interests represented by a portion of the purchase price which was, in accordance with the contracts of sale, placed in a depository account at the time of the sales in order to protect the buyer against various contingent liabilities of the corporation the stock of which was being purchased, was not income to the seller on cash basis in the year of sale. James H. Knecht, Jr., Esq., Statler Center, Los Angeles, Calif., for the petitioners. Marion Malone, Esq., for the respondent. VAN FOSSAN Memorandum Opinion VAN FOSSAN, Judge: Respondent determined deficiencies in the income taxes of petitioners as follows: Docket
No.
Year
Deficiency
79669
1956
$62,029.02
79670
1956
62,402.95
The parties stipulated that the only issue in these cases is the year in which funds held back from sale proceeds and placed into a depository account must be included in income for tax purposes. All of the facts are stipulated by written agreement and are incorporated herein by this reference and adopted as the facts of the cases. William O. and Glenna Anderson, petitioners in docket *214 No. 79669, are husband and wife and reside in Los Angeles, California. J. Irving and Grace H. Anderson, petitioners in docket No. 79670, are husband and wife and reside in Los Angeles, California. J. Irving and William O. Anderson are brothers. Each couple filed a joint income tax return for the taxable year 1956 with the district director of internal revenue at Los Angeles, California. William O. and J. Irving Anderson will be hereinafter sometimes referred to as petitioners or the Andersons. Petitioners, for the period here involved, maintained and kept their books and records on a cash basis of accounting. The Andersons collectively owned 46,548 shares of the common stock of United States Lime Products Corporation, hereinafter sometimes referred to as Products, which were purchased by the Flintkote Company, hereinafter sometimes referred to as Buyer, on September 19, 1956, pursuant to the terms of an agreement, hereinafter sometimes referred to as the stock sale agreement, entered into between the Andersons and Buyer on July 19, 1956. There was a total of 47,467 shares of Products outstanding as of the date of the sale, including those sold by the Andersons to Buyer. *215 The consideration paid by Buyer for the stock was $100 per share, or a total consideration of $4,654,800. The stock sale agreement contained, inter alia, provisions concerning the following subject matters: (a) Sellers' warranties and representations pertaining, for example, to such matters as the Andersons' ownership of the stock which was the subject of the sale; stock ownership of Products' subsidiaries (Arrowhead Lime & Chemical Company and Arizona Quarry & Stone Company); the actual corporate existence of the respective companies and their rights to conduct business; the states in which they were permitted to do business; the amount of stock of the corporations authorized, issued and outstanding; their financial standing; condition of their books and records; liabilities and contractual obligations of the respective companies; existing labor contracts, licenses and leases; personal and real properties owned; and operating conditions; (b) The terms and conditions of the closing, including the following requirements: 5. Closing. * * * (b) Buyer shall pay to Sellers the total purchase price of said shares, less $200,000, in such proportions as Sellers shall have theretofore *216 requested in writing; (c) The remaining $200,000 of the total purchase price of said shares shall be paid over to California Bank, as depositary, to be held by said bank under the terms of a depositary agreement the form of which has been submitted by Sellers to Buyer and agreed upon by both parties. Sellers have assured Buyer that said bank will act as depositary under said agreement. Nothing herein or in the depositary, agreement shall be deemed to limit the liability of Sellers hereunder. The purpose of the deposit of a portion of the purchase price of said shares is to provide a fund which will protect the Buyer to some extent against possible breaches of warranty and provide a measure of security for the performance and discharge by Sellers of their obligations and liabilities hereunder. This deposit plus payment of the balance of the purchase price of said shares as aforesaid shall constitute full payment of said purchase price for the purpose of closing this transaction. On September 18, 1956, an "Amendatory Agreement To Stock Purchase Agreement" was executed by the parties. By this agreement the "hold-back" and depository amount was raised to $500,000. It also provided *217 that the Andersons were to prosecute certain patents on mining claims on behalf of Products or its subsidiaries. By a separate concurrent agreement dated July 19, 1956, the Andersons sold to Buyer certain mining properties known as the "Apex Claims" for a total consideration of $139,250. This agreement contained, inter alia, the following paragraphs: 2. Purchase and Sale. Andersons agree to sell and convey Andersons' Apex Claims to Flintkote and Flintkote agrees to buy the same of and from Andersons for $139,250.00, concurrently with and contingent upon the sale and purchase of 46,548 shares of the common stock of United States Lime Products Corporation pursuant to the agreement dated July 19, 1956, * * *. It is understood and agreed that neither Flintkote nor the Andersons shall be under any obligation nor have the right to effect the transaction herein provided for, or the transaction provided for in the stock agreement, unless both are effected at one and the same time. * * *
5. Deposit in Escrow. It is understood that $200,000 of the purchase price payable under the stock agreement will be deposited in escrow to protect Flintkote to that extent against possible breach *218 of warranty under the stock agreement and to provide a measure of security for the performance and discharge by Andersons of their obligations thereunder. It is agreed that said deposit in escrow shall extend and apply to the warranties and obligations of Andersons under this agreement with like force and effect as if the purchase and sale of Andersons' Apex Claims and all warranties and agreements relating thereto were incorporated in the stock agreement. The above agreement was amended by an agreement dated September 18, 1956, which provided that the Andersons were to initiate and carry to a conclusion patents on certain mining claims. The change of the deposit fund from $200,000 to $500,000 was also noted. As indicated above, $500,000 of the purchase price for the stock and Apex Claims was paid by Buyer to California Bank, hereinafter sometimes referred to as the bank, as depositary, to be held pursuant to the terms of the Depositary Agreement executed by the bank, Buyer, and the Andersons on September 19, 1956. The Depositary Agreement contained, inter alia, the following provisions: 3. Said Depositary is hereby authorized from time to time to purchase with the funds in *219 the Impounded Property such United States Government securities or such securities listed on the New York Stock Exchange, the American Stock Exchange, the San Francisco Stock Exchange and/or the Los Angeles Stock Exchange as Andersons shall designate in writing, and from time to time upon written instructions from Andersons, to sell any of such securities and to purchase and sell other securities so listed and to invest and reinvest the Impounded Property in securities so listed, without the consent or approval of Flintkote. The Depositary is authorized and instructed to accept and receive all interest, dividends and income paid upon the Impounded Property and all profits and proceeds derived therefrom; and the Depositary shall pay to Andersons semi-annually at the times and in the manner set forth in Paragraph 4 hereof, and subject to the conditions provided in said Paragraph 4, all interest, dividends and income paid upon the Impounded Property and all net profits derived therefrom. The Depositary shall make no investments, purchases nor sales except upon the written instructions of Andersons, except sales required to convert the Impounded Property into cash as hereinafter provided. *220 4. The Depositary shall mail to Flintkote and to Andersons at their respective addresses shown below on or before January 10, 1957, and on or before each July 10th and January 10th thereafter during the existence of this agreement, a written statement containing an itemized list of the Impounded Property and the market value of each security on the last day of the preceding semiannual period ended December 31st and June 30th. The Depositary shall pay and transmit to Andersons with each such semiannual statement an amount equal to (a) the aggregate dividends, interest and income derived from the Impounded Property during the preceding semiannual period, and (b) the total net profit, if any, derived from all purchases and sales during such period; provided that if the value of the Impounded Property at the end of the preceding six months' period shall be less than $500,000, then the Depositary shall pay to Andersons only the amount, if any, by which such dividends, income, interest and profits plus the aggregate market value of the Impounded Property exceed $500,000. 5. (a) If Flintkote does not give notice in writing to the Depositary and to the Andersons on or before September 19, 1958, that *221 Flintkote claims a breach of warranty or obligation under the Stock Purchase Agreement or the Apex Agreement, then the Depositary shall immediately pay and deliver all of the Impounded Property to Andersons, and this Depositary Agreement shall be at an end. (b) If at any time prior to September 19, 1958, United States patents as described in Paragraph 10a of the Stock Purchase Agreement and Paragraph 4a of the Apex Agreement have been obtained covering all the property with respect to which the Andersons are required in said paragraphs to undertake patent proceedings, then Flintkote shall forthwith give written notice to the Depositary and to the Andersons reciting that fact. Upon receipt of such written notice from Flintkote, the Depositary shall immediately pay and deliver to the Andersons all of the Impounded Property then in Depositary's possession, except for such sums as the Depositary shall be required to hold and retain pursuant to the provisions of Paragraph 6 hereof. (c) If at any time prior to September 19, 1958, Flintkote becomes satisfied that, by reason of the patent of mining claims or otherwise, the amount of the Impounded Property has come to be substantially in *222 excess of the amount reasonably required to satisfy any remaining potential liability of the Andersons under the Stock Purchase or Apex Agreements, Flintkote shall forthwith give written notice to the Depositary and to Andersons, which notice shall recite that fact and set forth the amount of said excess. Upon receipt of said written notice from Flintkote, the Depositary shall forthwith forward a copy of such notice to Andersons, shall immediately convert into cash sufficient of the Impounded Property to yield the sum set forth in Flintkote's notice, and shall, upon the expiration of 30 days from receipt of said notice, pay said sum to Andersons. (d) If at any time prior to September 19, 1958, Flintkote shall have become entitled to any payment from Andersons under Paragraph 10b of the Stock Purchase Agreement, then Flintkote shall give to the Depositary and to the Andersons written notice reciting that fact and the amount to which it is so entitled. Upon the receipt of any such notice, the Depositary shall forthwith forward a copy of such notice to Andersons, shall convert into cash sufficient of the Impounded Property to yield the sum set forth in Flintkote's notice and shall, *223 at the expiration of 30 days from receipt of said notice, pay said sum to Flintkote. (e) If at any time prior to September 19, 1958, the Andersons shall have expended any sum pursuant to their obligation to carry out patent proceedings under Paragraph 10a of the Stock Purchase Agreement or Paragraph 4a of the Apex Agreement, or pursuant to their obligation under Paragraph 10 of the Stock Purchase Agreement and Paragraph 4 of the Apex Agreement to defend Flintkote and others of and from the liabilities, losses, claims and demands covered thereby involving title to mining claims, then Andersons may give to Depositary and Flintkote written notice reciting that fact, which notice shall state the amount so expended. Upon receipt of any such notice from Andersons, the Depositary shall forthwith forward a copy of such notice to Flintkote, shall convert into cash sufficient of the Impounded Property to yield the sum specified in such notice, and shall, at the expiration of 30 days from receipt of such notice, pay said sum to Andersons. 6. If Flintkote claims a breach of warranty or obligation under said Agreements or either of them at any time prior to September 19, 1958, then Flintkote *224 may give to the Depositary and to Andersons notice in writing of such claim, specifying the breach and the estimated amount of the liability for such breach. Upon the receipt of any such notice, the Depositary shall forthwith forward to Andersons a copy of such notice and shall convert into cash and thereafter hold and retain in that form so much of the Impounded Property as shall in the discretion of the Depositary be necessary to satisfy the estimated liability set forth in said notice, but in no event less than the amount designated by Flintkote in said notice, until such time as the Depositary is directed to dispose of the same by joint written order of Flintkote and Andersons or by final order or judgment of a court of competent jurisdiction, in either of which events the Depositary shall dispose of the Impounded Property in accordance with such order or judgment. No portion of the Impounded Property held and, retained under the provisions of this Paragraph 6 shall, while so held, be subject to disposal under Paragraph 5 hereof. * * *
8. Flintkote and Andersons reserve the right upon joint written notice to the Depositary and upon payment of any sums due it for fees and *225 charges to terminate this Agreement and to withdraw any property held hereunder. This Agreement shall continue in effect until terminated pursuant to this paragraph or pursuant to Paragraph 5(a) above. The bank was to be paid by petitioners and Buyer on an equal basis except that petitioners were to pay the expenses of buying and selling securities. Petitioners directed the investment of the fund throughout the period it was held by the bank. The bank provided the Andersons with the semiannual statements as required by the Depositary Agreement. The market value of the assets held by the bank fell below $500,000 as of December 31, 1957. Accordingly, the income of $6,278.05, earned on the fund during the last half of the calendar year 1957, was withheld by the bank. This income has continued to be withheld by the bank, no part of which has been received by petitioners. Except as indicated above, the petitioners have received the income from the fund as provided in the Depositary Agreement. Petitioners were reimbursed, as provided in the Depositary Agreement, for expenditures incurred in connection with patent proceedings regarding mining claims in the amount of $15,132.84 on July 19, 1957, and *226 $16,763.03 on December 22, 1959. On or about September 5, 1958, Buyer set a letter to the bank, which letter contained the following paragraph: With reference to the Depositary Agreement (Revised Form) dated September 19, 1956 between yourselves, The Flintkote Company, and William O. Anderson and J. Irving Anderson pursuant to paragraph 6 thereof, The Flintkote Company claims a breach of warranty or obligation under the agreement therein referred to by reason of non-disclosed tax liabilities, failure of certain titles to be merchantable and inability to obtain requisite United States patents with respect to certain claims, and hereby advise you that the estimated amount of liabilities for such breach is $225,000. From the funds held in the depository account, the sum of $259,704.13 was remitted to the petitioners on or about September 19, 1958. The amounts received by petitioners during 1958 were reported on their respective income tax returns for that year and the tax thereon was paid. The remaining amount of the fund was and is presently held by the bank, pursuant to the Depositary Agreement. The parties stipulated that the terms and provisions of the stock sale agreement, *227 the agreement concerning the Apex Claims, and the Depositary Agreement were agreed upon between the Andersons and Buyer solely for business motives, i.e., for reasons other than tax purposes. The sole issue concerns the year in which the fund, set aside and held on deposit under the various agreements set forth above, must be taken into income for tax purposes. Respondent contends that the $500,000 is taxable to petitioners in the year 1956 as a long-term capital gain. The crux of respondent's position is that petitioners' control over the fund throughout its existence renders the fund taxable to them in the year of sale. He relies on the principle enunciated by the Supreme Court, speaking through Mr. Justice Holmes, in Corliss v. Bowers, 281 U.S. 376. The learned Justice Holmes opined (p. 378) that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid." Respondent further cites the cases of Federal Development Co., 18 B.T.A. 971, and Scott P. Myers, 30 B.T.A. 44, which, in his opinion, apply the principle of the Corliss case. *228 Petitioners contend that the $500,000 is taxable to them only in the year or years, and only to the extent that the funds are distributed from the depository account to petitioners. They rely on Preston R. Bassett, 33 B.T.A. 182, affd. 90 F. 2d 1004 (C.A. 2); Stoner v. Commissioner, 79 F. 2d 75 (C.A. 3); and Marion H. McArdle, 11 T.C. 961. On the one hand, we have the following factors weighting the balance toward respondent's position: The full purchase price was paid for the stock, some $500,000 of which was set aside to protect the purchaser; the fund could be reached by the purchaser, in the event the liabilities materialized only with the consent of petitioners; the fund was subject to being, and in fact was, tapped to reimburse petitioners for the expenses incurred in prosecuting mining patents; petitioners received all the income from the fund; they could direct the investment of the fund in recognized securities including those listed on the Los Angeles and San Francisco exchanges. Thus, in effect, it would be possible apparently for petitioners to utilize the funds as capital for a new corporate venture undertaken *229 by them. However, we must recognize that the following facts shift the balance toward the petitioners: The fund was not unqualifiedly petitioners', i.e., just as Buyer could not freely use the funds, neither could the petitioners; the fund might never belong to petitioners if the liabilities materialized and, in fact, Buyer filed a letter with the bank, thus making claim to $225,000 of the fund; and as of the date of the trial, the bank was still holding this amount. This qualified control of the fund and income is particularly demonstrated by the provision that the bank withhold income if the fund dropped below $500,000. It appears that income was in fact withheld for that very reason. Although the petitioners had a free hand in investment of the money, still they lacked the ultimate incident of ownership, viz., the power simply to pick up the money, put it into their pockets, and spend it at will and for whatever they deemed advisable. The cases of Federal Development Co., supra, and Scott P. Myers, supra, are relied upon by respondent. The taxpayers there involved were apparently on an accrual basis of accounting. Petitioners are on a cash basis, *230 which would make the above cases distinguishable and would place these facts within the rule of Preston R. Bassett, supra ( p. 190): Moreover, where the petitioner is, as here, on the cash basis, pretty clear evidence of his command over the money held in escrow would have to be present to justify our holding that it was received in the year of execution of the contract, although not paid over until nine months later. In Stoner, supra, under similar facts, we held that the income was taxable to the taxpayer in the year of sale. In doing so we relied upon the fact that the taxpayer received all the proceeds and then voluntarily deposited a portion thereof to protect the purchaser, and upon the fact that the seller received the interest from the money so deposited. The Court of Appeals for the Third Circuit reversed and held that the facts did not warrant the inclusion of the funds as income in the year of the sale. Stoner v. Commissioner, supra. Our decision in Federal Development Co., supra, also recognized the receipt of interest as an important factor. And it should be noted that in neither Preston R. Bassett, supra, *231 nor Marion H. McArdle, supra, did the taxpayers receive the income from the fund. However, we have since recognized and accepted the reversal in the Stoner case (see Bassett and McArdle), and recently in the case of Margaret L. Carpenter, 34 T.C. 408, we announced that the mere receipt of income from the fund was insufficient to bring the incidents of taxation to bear over the complete purchase price in the year of the sale. This Court pointed out that the taxpayer in the Carpenter case, supra, lacked control of the fund by noting that "She could not, for example, consume principal, convert to a tax-free debt security or to an equity security, all of which things are often desirable." The taxpayers involved in Bassett and McArdle, supra, lacked control over investment. However, the taxpayer, upon whom we permitted the tax to be levied, possessed similar control in the Myers case, supra. The petitioners in the instant case had control, but did not have the power to consume principal. The issue, therefore, narrows to whether petitioners, by reason of their power to direct investment of the fund, have transgressed beyond the line drawn by McArdle, Bassett, *232 and Carpenter. We hold that they have not. What we regard significant here is not so much the power to control the precise investment of the fund, but the fact that the "cash was not unqualifiedly subject to the demand of the sellers." Harold W. Johnston, 14 T.C. 560, 565. The bank was agent for both petitioners and Buyer. Neither could obtain the fund without the other's consent. If the fund fell below the $500,000 level, income was to be withheld to make up the difference. It would appear that this provision applied to withdrawals made to reimburse petitioners for the patent claim expenses. The money was held subject to qualifications. Petitioners could not consume principal and, in fact, might never receive the money. We hold that the sum of $500,000, set aside pursuant to the sales contracts, was not includible in income in the year 1956. Harold W. Johnston, supra; Margaret L. Carpenter, supra; Preston R. Bassett, supra; Marion H. McArdle, supra; Stoner v. Commissioner, [1] supra. See, also, Cleveland Trinidad Paving Co. (Ohio), 20 B.T.A. 772; Fred C. Hall, 15 T.C. 195, affd. *233 , 194 F. 2d 538 (C.A. 9).
Decisions will be entered for the petitioners. Footnotes
1. Stoner v. Commissioner, 79 F. 2d 75 (C.A. 3): Generally speaking, the Income Tax Law is concerned only with realized gains. * * * There was no receipt of his share of the fund by the taxpayer in 1929 as realized gain. * * * Thus, Stoner, as an individual taxpayer, did not receive his share of the fund until 1931, or have any right to it, * * *. There could be no realized gain in the fund by any of the shareholders until 1931. * * * but he had in 1929 only qualified possession and control of the whole fund and was not entitled to apportion and take his share until 1931, when the terms of the contract were fulfilled. It was then and not until then that he received the $13,965.04, his share and the interest thereon, of the fund. Contrary to the board, we are of the opinion that the principle of Commissioner v. Cleveland Trinidad Paving Company, 62 F. 2d 85↩ (C.C.A. 6) should be extended to the facts of this case. * * *