James G. Thompson v. Commissioner.
Thompson v. Commissioner
Docket No. 3598-62.
United States Tax Court
T.C. Memo 1964-198; 1964 Tax Ct. Memo LEXIS 140; 23 T.C.M. (CCH) 1193; T.C.M. (RIA) 64198; July 20, 1964
Carl A. Stutsman, Jr., 411 W. 5th St., Los Angeles, Calif., and Jack R. White, for the petitioner. Thomas F. Greaves, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioner's income tax, as follows: Taxable Year
Amount
1956
$28,480.01
1957
21,444.79
1958
41,640.75
1959
25,597.95
1960
23,286.57
The parties have agreed to certain adjustments with respect to the deficiencies. The remaining issues for decision are: (1) Whether the sum of $200,000 payable to petitioner by virtue of a certain agreement executed in March 1956 constitutes ordinary income or long-term capital gain; (2) whether, in the year 1960, petitioner received additional interest income in the amount of $7,767.87; (3) whether petitioner, *141 in the year 1958, suffered a "theft" loss in the amount of $23,000; and (4) whether petitioner is entitled to claim business deductions for entertainment, yachting, and travel in the year 1956. Findings of Fact Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner resided in Huntington Park, California, during the years involved herein. He filed his individual income tax returns computed on a cash basis for the taxable years involved with the district director of internal revenue at Los Angeles, California. Tapered Air Products Corp. (hereinafter referred to as Tapered) was a corporation organized under the laws of the State of California. Tapered was organized for the purpose of engaging in the business of milling aluminum sheets into aircraft wings with machinery and equipment designed by petitioner. The stock of Tapered was owned 70 percent by petitioner, 15 percent by Gust Fotis (hereinafter referred to as Fotis), and 15 percent by Victor Kaytis (hereinafter referred to as Kaytis). Aero Tool Sales Corporation (hereinafter referred to as Aero) was a corporation *142 organized under the laws of the State of California. It was organized for the purpose of owning and renting to Tapered the machinery and equipment used to manufacture aircraft wings. All of the stock of Aero was owned by petitioner. Avi-Air, Inc., (hereinafter referred to as Avi-Air) was a corporation organized under the laws of the State of California. The controlling stockholders of Avi-Air for all purposes material hereto were Lloyd L. Hill (hereinafter referred to as Hill) and Oliver M. Bell (hereinafter referred to as Bell). Petitioner is not in any way related to Hill or Bell. On October 7, 1955, petitioner entered into a written agreement with Avi-Air, Hill, and Bell for the sale by petitioner to Avi-Air of all the stock owned by petitioner in Tapered and all of the stock of Aero. The total purchase price was $1,150,000, payable $70,000 currently with the execution of the contract and the balance, $1,080,000, to be paid over a period of eight years. A promissory note bearing 4 1/2 percent interest and secured by a chattel mortgage on the equipment owned by Tapered and Aero as well as a pledge of the stock of the two corporations was executed by Avi-Air. The agreement *143 provided, in part, as follows: In connection herewith, it is recognized by and between the parties that underlying the capital stock purchased hereby are certain machines and equipment of advanced and specialized design and it is agreed by and between the parties that the fair market value of said machinery and equipment of Tapered Air Products Corp. and Aero Tool Sales Corporation is $1,150,000.00 and the net working capital is approximately $150,000.00. The parties further agree that in view of the fact that the companies are wholly engaged in defense industries and the contracts are awarded on a competitive bid basis no goodwill exists or was contemplated in the valuation and sale of the stock hereby. The sales agreement did not contain a provision prohibiting petitioner from competing with Avi-Air. However, the employment agreement, infra, did contain such a clause. In addition to said agreement for the sale of stock and as part of the same transaction, petitioner and Avi-Air entered into numerous other agreements and contracts dated October 7, 1955. One such contract was an employment contract whereby petitioner was to be employed by Avi-Air. It was Avi-Air's idea to obtain *144 the services of petitioner. The equipment and machinery of Tapered and Aero had been designed by him. He had selected and trained the employees of Tapered. It was felt by Avi-Air that the services of petitioner would be necessary for a transitional period. The pertinent parts of the employment contract are as follows: I The EMPLOYER does hereby hire and employ THOMPSON to be a Consulting Engineer and to perform all the duties incident to such position for a period of eight (8) years from and after October 1, 1955, at an annual compensation of not less than Eighteen Thousand Dollars ($18,000.00) per annum, such compensation to be payable in monthly or other convenient installments as agreed upon from time to time between THOMPSON and the EMPLOYER. II THOMPSON does hereby agree to perform faithfully all of the duties incident to the position of Consulting Engineer, and to devote reasonably his time, attention and abilities thereto. THOMPSON shall not engage, during the term of this contract in any other business or line of work, whether as proprietor or employee, which shall be competitive with the lines of business carried on by EMPLOYER, without the prior written consent of *145 EMPLOYER being first had and obtained. III This contract may be terminated by the EMPLOYER only for cause, which shall mean continued intoxication while in the course of employment, moral turpitude achieving such publicity as to reflect adversely upon the EMPLOYER or its business, or breach of the provisions just hereinabove contained. If this contract shall be terminated by the EMPLOYER other than for cause, THOMPSON shall be entitled to the compensation agreed upon during the remaining term of the agreement and shall not be required to mitigate damages by seeking other employment. This contract was amended so that the rendering by petitioner of his services six days a month would constitute full performance of his obligations. The following collateral agreement was also executed on October 7, 1955.. COLLATERAL AGREEMENT THIS AGREEMENT made this 7 day of October, 1955, by and between JAMES G. THOMPSON, an individual, of Los Angeles, California, hereinafter called "THOMPSON", and AVI-AIR, INC., a corporation organized and existing under the laws of the State of California, hereinafter called "AVI-AIR". WITNESSETH WHEREAS, the parties hereto are concurrently entering *146 into an agreement for the sale of all of the capital stock owned by Thompson in Tapered Air Products Corp. and Aero Tool Sales Corporation to Avi-Air, and WHEREAS, the Federal and State Governments have not made an audit of the income tax returns of Tapered Air Products Corp. and Aero Tool Sales Corporation for the fiscal years ended July 31, 1955, and prior thereto, and WHEREAS, the Federal Government has not completed its audit in connection with the renegotiable contracts or work performed by Tapered Air Products Corp. IT IS THEREFORE AGREED: 1. That certain agreement for the sale of Thompson's stock in Tapered Air Products Corp. and Aero Tool Sales Corporation to Avi-Air is incorporated herein and made a part hereof as though set forth at length. 2. Any Federal Corporate income taxes and/or State Corporate franchise taxes due with interest and penalties that may be found to be due for the fiscal years ending July 31, 1955, and prior thereto of Aero Tool Sales Corporation and Tapered Air Products Corp. shall be borne 90% by Thompson and 10% by Avi-Air. 3. Any net refunds (after taking into consideration tax benefits) due to the Federal Government on renegotiable contracts *147 shall be borne 90% by Thompson and 10% by Avi-Air. 4. It is expressly agreed, however, that any deficiency that shall be owed by Thompson by reason of paragraphs 2 and 3 above shall be paid and deducted by Avi-Air out of the interest payments due to Thompson on that certain promissory note being executed concurrently herewith in the amount of $1,080,000.00. Thompson's total liability for any tax deficiency interest and penalties and renegotiation refunds shall be limited to the amount of any interest received or receivable by him under said promissory note. 5. To secure the payment by Thompson of his share of any tax deficiency or renegotiation refund, Avi-Air is authorized and directed to make all interest payments due Thompson to the account of Kindel & Anderson, Attorneys at Law, who will, in turn, impound said interest payments in their trust account. 6. In connection with such funds impounded, it is hereby agreed that Thompson shall have the right to invest such funds in U.S. Government Bonds, Federal Savings and Loan Associations and National Savings Banks. IN WITNESS WHEREOF, the parties hereto have hereunto signed this Agreement. /s/ JAMES G. THOMPSON AVI-AIR, INC. *148 , a California corporation By: /s/ O. M. Bell, Pres. By: /s/ L. L. Hill, Sec. Also on October 7, 1955, the following collateral agreement was executed: COLLATERAL AGREEMENT THIS AGREEMENT made the 7 day of October, 1955, between JAMES G. THOMPSON, an individual of Los Angeles, California, hereinafter called "Thompson", and AVI-AIR, INC., a Corporation organized and existing under the laws of the State of California, hereinafter called "Avi-Air". WITNESSETH: WHEREAS, concurrently herewith Thompson in entering into an agreement for the sale of his stock interest in Tapered Air Products Corp. and Aero Tool Sales Corporation to Avi-Air, and WHEREAS, Tapered Air Products Corp. and Aero Tool Sales Corporation have been in the business of milling sheets for aircraft use, and WHEREAS, Avi-Air is contemplating the establishment of an Eastern facility organization for the milling of aircraft sheets in the middle or eastern portion of the United States. IT IS THEREFORE AGREED: In consideration of ONE DOLLAR ($1.00) in hand paid by Thompson to Avi-Air, and in consideration of the covenants and terms of that certain agreement to sell stock to Avi-Air, Thompson is hereby granted *149 an option to acquire thirty per cent (30%) of the common capital stock interest of any Eastern facility that may be established either directly or indirectly by Avi-Air during the period from the date of this Agreement to January 15, 1964. The purchase price of such 30% interest shall be the issuing price at which the stock is initially authorized to be sold under the laws of the State of incorporation, but in no event shall such price exceed $5,000.00 for such thirty per cent (30%) interest. IN WITNESS WHEREOF, the parties have hereunto signed this Agreement. /s/ JAMES G. THOMPSON, An Individual AVI-AIR, INC., a California corporation, By: /s/ O. M. Bell, Pres. By: /s/ L. L. Hill, Sec. Treas. At the same time petitioner agreed to sell his stock, Fotis and Kaytis entered into separate agreements with Avi-Air agreeing to sell their stock in Tapered to Avi-Air for the sum of $75,000 each. The purchase price was to be paid $5,000 at the execution of the agreements and $70,000 pursuant to the terms of a promissory note executed at the same time. In order to make the down payments to petitioner, Fotis, and Kaytis, Avi-Air borrowed money from Tapered. Petitioner felt this impaired *150 his security. He believed that the use of Tapered's working capital in this manner had impaired the security for payment of the note he received from Avi-Air. He felt misrepresentations had been made to him by Hill and Bell and that his business was taken away from him by fraud. He stopped performing his part of the employment contract but Avi-Air continued paying his salary. Because of these events, petitioner on February 3, 1956, instituted suit in California to have have the sales agreement of October 7, 1955, rescinded. Petitioner was joined in his suit by Fotis and Kaytis. The defendants were Tapered, Aero, Avi-Air, Hill, and Bell. [1]
In early March 1956 petitioner contacted Hill for the purpose of having a meeting to see if their difficulties could be settled without court action. A meeting was arranged a few days before the date set for the hearing. Only petitioner and Hill were present *151 at this meeting. It was agreed at this meeting that Avi-Air would pay petitioner an additional $200,000 and that petitioner would withdraw his suit to rescind the contract of October 7, 1955. The drafting of a new agreement was left to the attorneys for petitioner and Avi-Air. The question of petitioner's employment contract did not come up at this meeting, nor did petitioner and Hill discuss a covenant not to compete. During the period of time after the meeting between petitioner and Hill and March 23, 1956, there were numerous discussions between the attorneys for each side and numerous discussions between each side and their attorneys. It was during this time that petitioner decided he did not want to continue in the employ of Avi-Air, and he authorized his attorneys to cancel the employment contract. Hill wanted petitioner to continue in the employ of Avi-Air, or at least stay on as a member of the board of directors. Hill's attorneys wanted to have petitioner's employment contract cancelled and to have a covenant not to compete provision inserted in any new agreement. The results of these meetings and negotiations were revealed in a new agreement dated March 23, 1956. The pertinent *152 parts of this agreement follow: * * *
I. PRIOR REPRESENTATIONS AND AGREEMENTS OF THE PARTIES. (A) In the negotiation of said transaction, in the dealings between the parties since the time of said transaction, and in the negotiations for the resolution of said controversy and settlement of all differences between the parties, a number of conversations and other communications occurred between the parties and various representations, offers and counteroffers have been made. Each party has been fully advised by counsel in the premises. Each party has been represented by counsel in the negotiation, preparation and execution of this agreement. Each party has been put upon inquiry and has had full opportunity to investigate any representations, offers, or counteroffers made by the other party or parties and has made such investigations to the full satisfaction of the said party. * * *
III. RATIFICATION, REFORMATION, RESCISSION AND CANCELLATION OF VARIOUS AGREEMENTS AND DOCUMENTS FOR THE SALE OF STOCK. (A) Agreement for Sale of Stock. That certain agreement for sale of stock dated October 7, 1955, between Thompson, Avi-Air, Inc., Hill, and Bell (identified as Exhibit *153 A1 to Complaint in the aforesaid action) is hereby reformed, modified, and amended effective as of October 7, 1955 to consist solely of the following provisions of this paragraph III(A): * * *
(5) Purchase Price. (a) The purchase price for the aforesaid stock is and shall be One Million Five Hundred Thousand Dollars ($1,500,000.00) heretofore paid or payable by Avi-Air as follows: (i) $75,000.00 having been paid to Kaytis on October 7, 1955, receipt of which is hereby acknowledged. (ii) $192,000.00 having been paid to Thompson from time to time between October 7, 1955 and the date hereof, including the sum of $13,780.76 representing Thompson's note for said amount to Avi-Air dated October 7, 1955 in the sum of $13,500.00 with interest due thereon in the sum of $280.76, which said note is being hereby cancelled as provided in paragraph III(F) below. (iii) $1,008,000.00 to be paid to Thompson in accordance with the terms of and representing the unpaid balance of that certain promissory note referred to in paragraph III(B) below, a copy of which is attached hereto as Exhibit "A" and which is hereinafter sometimes referred to as the "Secured Note". (iv) $150,000.00 to *154 be paid to Thompson in accordance with the terms of that certain promissory note being executed concurrently herewith, a copy of which is attached hereto as Exhibit "B" and which is hereafter sometimes referred to as the "Unsecured Note". (v) $7,000.00 having been paid to Fotis between October 7, 1955 and the date hereof. (vi) $68,000.00 to be paid to Fotis in accordance with the terms of that certain promissory note referred to in paragraph III(E)(4) below. (b) In connection herewith it is recognized and agreed by and between the parties that underlying the aforesaid capital stock were certain machines and equipment of advanced and specialized design having a fair market value on October 7, 1955 in excess of $1,350,000.00 and that the net working capital on such date was approximately $150,000.00. The increase in said purchase price above that set on October 7, 1955 represents an amount paid or to be paid solely to secure and quiet title in Avi-Air to said capital stock and said entire increase is attributable pro rata to said machines and equipment. The parties further recognize and agree that in view of the fact that Jagett [see Footnote 1, supra] and Aero were wholly engaged *155 in defense industries and their business was obtained upon a competitive bid basis, no value was attributed to the good will of said corporations in the valuation and sale of said stock. * * *
(B) The Secured Note. That certain corporate promissory note dated October 7, 1955 in the sum of $1,080,000.00 from Avi-Air to Thompson (identified as Exhibit A5 to said Complaint and referred to herein as the "Secured Note") is hereby amended as set forth in that document entitled "Amended Promissory Note" dated October 7, 1955 in the sum of $1,080,000.00 from Avi-Air to Thompson, a copy of which is attached hereto as Exhibit "A", and as so amended is hereby ratified, confirmed and approved. Thompson hereby acknowledges that the unpaid principal amount of the Secured Note at date hereof is $1,008,000.00 and that interest thereon has been paid in full through March 7, 1956. (C) Collateral Agreement. That certain collateral agreement between Thompson and Avi-Air dated October 7, 1955 (identified as Exhibit A3 to said Complaint) is hereby reformed, modified, and amended effective as of October 7, 1955 to consist solely of the following provisions of this paragraph III(C): (1) Any *156 Federal corporate income taxes and/or State corporate franchise taxes due, with interest and penalties that may be found to be due, for the fiscal years ending July 31, 1955 and prior thereto, of either Jagett or Aero, or both, shall be borne 90% by Thompson and 10% by Avi-Air; provided, however, that Thompson's maximum liability under this subparagraph (1) shall not exceed the smaller of (a) Total of the interest payments becoming due after October 7, 1955 on the Secured Note and the Unsecured Note, or (b) $90,000.00. * * *
(2) Prior to the determination of any such Federal or State tax deficiencies, said interest including any interest heretofore impounded shall be paid directly to Thompson. Upon any such determination and upon prior written notice from Avi-Air to Thompson, Avi-Air shall withhold and apply toward the payment of Thompson's liability to Avi-Air under paragraph III(C)(1) above the full amount of interest payments on the Secured and Unsecured Notes becoming due after the date of any such determination until said liability is discharged. (3) In the event Thompson's liability under paragraph III(C)(1) above exceeds the total of the interest payments on the *157 Secured and Unsecured Notes becoming due after the date of any such determination of Federal or State deficiencies, and withheld by Avi-Air hereunder, an amount equal to the smaller of (a) the total of interest payments on the Secured and Unsecured Notes between October 7, 1955 and the date of commencement of application of interest payments by Avi-Air to said liability, and (b) the unpaid balance of Thompson's liability under paragraph III(C)(1) above shall be withheld and deducted by Avi-Air from the last payment or payments of principal due on the Secured and Unsecured Notes. (4) Any net refunds (after taking into consideration tax benefits) due to the Federal government under the Renegotiation Act by reason of renegotiable contracts performed by Jagett, Aero and Avi-Air shall be borne by Avi-Air. * * *
(D) Covenant Against Competition. Thompson's covenant against competition formerly contained in that certain Employment Contract referred to in paragraph III(G)(6) below is hereby reformed, modified, and amended to consist solely of the following provisions of this paragraph III(D): (1) During the period commencing with the date hereof and expiring January 15, 1964, Thompson *158 shall not, directly or indirectly, whether through the furnishing of services (as an employee or independent contractor, or otherwise) or capital, or otherwise, enter into competition with Avi-Air in any business similar to that carried on by Jagett and Aero during such times as Thompson was a stockholder thereof, in the counties of Los Angeles and San Diego, State of California and such other county or counties, city or cities in California or such other states in which the business of said corporations was carried on during such times, so long as Avi-Air shall during said period of time carry on a like business therein. (2) It is the intent of the foregoing subparagraph (1) to furnish to Avi-Air the maximum protection against such competition by Thompson during the said period of time as is provided by the law of any jurisdiction in which this Agreement may be enforced, but not to impose any restraint not enforceable at law. In the event any court of competent jurisdiction shall hold the within restraint to be unreasonable either as to length of time or geographical scope, or both, then the extent of said restraint shall be for such period of time and with such geographical scope *159 as said Court shall find to be reasonable and enforceable at law. (3) It is hereby stipulated and agreed that by the nature of this case it would be impracticable and extemely difficult to fix or compute the actual damage which Thompson would cause Avi-Air to sustain by breach of his obligations contained in this paragraph III(D). It is therefore agreed that (a) During any period of time that Thompson shall act in violation of this paragraph III(D), Avi-Air may, upon prior written notice to Thompson claiming a breach of this paragraph III(D), withhold as a reasonable sum for liquidated damages for such breach, and shall have no further liability to pay, any one or more installments of interest and principal on the Secured and Unsecured Notes which otherwise would fall due during such period of time. (b) As an additional remedy to Avi-Air to that provided in subparagraph (a) above, Avi-Air may also seek and obtain injunctive relief in any court of competent jurisdiction against continuation by Thompson of any breach of his obligations contained in this paragraph III(D) or other equitable relief. * * *
(G) Various Documents Rescinded. The following documents are hereby *160 rescinded, released and cancelled and shall have no further force or ecect; (1) That certain subordination agreement dated October 7, 1955 between Thompson and Avi-Air (identified as Exhibit 4A to said Complaint). (2) That certain chattel mortgage dated October 7, 1955 from Jagett to Thompson (identified as Exhibit A6 to said Complaint). (3) That certain chattel mortgage dated October 7, 1955 from Aero to Thompson (identified as Exhibit A7 to said Complaint). (4) That certain guaranty of performance of contract of purchase dated October 7, 1955 between Jagett and Thompson (identified as Exhibit A8 to said Complaint). (5) That certain guaranty of performance of contract of purchase dated October 7, 1955 between Aero and Thompson identified as Exhibit A9 to said Complaint). (6) That certain employment contract dated October 7, 1955 between Avi-Air and Thompson (identified as Exhibit A10 to said Complaint) and the memorandum agreement re same (identified as Exhibit All to said Complaint). * * *
The machinery and equipment referred to in paragraph III(A)(5)(b) of the March 23, 1956, agreement is identical to and the same as the machinery and equipment referred to in *161 the agreement of October 7, 1955. The pertinent part of the promissory note, which is Exhibit A to the agreement of March 23, 1956, provides as follows: Avi-Air's obligations hereon are conditioned upon the observance by Thompson of certain restrictions upon him as set forth in that certain Agreement between Thompson et al. and Avi-Air et al. dated March 23, 1956. The provision in the March 23 agreement prohibiting petitioner from competing was very broad in its scope. Although Avi-Air wanted this provision in the contract, it was not considered of vital importance as long as petitioner continued on as a member of Avi-Air's board of directors. The parties did not place any value on the covenant not to compete. Of the $200,000 additional amount to be paid, petitioner during the years in issue received $180,673. No part of the $200,000 to be paid to petitioner pursuant to the March 23 agreement was for the covenant not to compete and/or the cancellation of the employment contract of October 7, 1955. In 1960 Avi-Air paid certain Federal corporate income taxes and State corporate franchise taxes which were determined in 1960 to be due from Tapered and Aero for the fiscal year *162 ended July 31, 1955, and prior fiscal years. Of the taxes so paid, the sum of $7,767.87 was to be borne by petitioner under the provisions of paragraph III(C) of the March 23 agreement. The $7,767.87 was paid by Avi-Air directly to the Federal and State tax agencies and not to petitioner. The payment of the $7,767.87 by Avi-Air did not constitute the receipt of interest income by petitioner. Early in 1955 petitioner was contacted by a representative of the New Frontier Hotel Corporation (hereinafter referred to as Hotel). Hotel is a corporation organized under the laws of Nevada. It was organized to operate a hotel and a gambling casino. Petitioner was requested to make a cash investment in Hotel. A subscription agreement was executed by Hotel on June 3, 1955, and given to petitioner. The pertinent parts of the subscription agreement follow: The undersigned hereby agrees to purchase 1.60 shares of stock of the NEW FRONTIER HOTEL CORP., a Nevada corporation, at the price of $2,500.00 per share. The undersigned further agrees to loan to the New Frontier Hotel Corp. the sum of $31,000.00, said loan to be evidenced by a Promissory Note executed by the New Frontier Hotel Corp. in *163 favor of the buyer, which note shall bear interest at the rate of 6% per annum and shall be due and payable on or before FIVE (5) years from the date hereof. Buyer understands that in purchasing the aforesaid stock, he will be required to qualify and be licensed by the Nevada Tax Commission as a gambling licensee and Buyer agrees that in the event any license that may be issued to him shall be suspended, revoked, terminated or cancelled for any reason whatsoever, he will, upon demand, sell and dispose of the stock being purchased by him hereunder to the New Frontier Hotel Corp. or such other person or persons as the New Frontier Hotel Corp. may designated [be designate] at the actual book value of said stock. In computing such book value no valuation shall be placed upon the good will or any other intangible asset. In such event, the amount loaned by Buyer shall be returned to him within THIRTY (30) days after the date of such suspension, revokation [revoke], cancellation or termination of the license. Buyer agrees that he will immediately upon the execution of this Subscription Agreement, deposit the purchase price of the above stock and the amount of the above loan with *164 the New Frontier Hotel Corp. Upon the granting of a license to Buyer by the Nevada Tax Commission, the New Frontier Hotel Corp. will deliver to the Buyer a certificate covering the aforesaid 1.60 shares of stock and a Promissory Note covering the aforesaid loan executed by the New Frontier Hotel Corp. as hereinabove provided, together with a certified copy of a resolution of the Board of Directors of the New Frontier Hotel Corp. authorizing the execution and delivery of said Promissory Note. In the event that a license is denied, the Buyer, by the Nevada Tax Commission, then the purchase price of the stock and the amount of the loan deposited with the New Frontier Hotel Corp. shall be returned to the Buyer within THIRTY (30) days after the date of such denial. DATED June 3, 1955 Buyer Mr. J. Thompson On May 26, 1955, petitioner gave his check for $35,000 to Hotel. This amount was in full payment of his liability under the subscription agreement. On October 18, 1955, petitioner gave his check for $8,000 to Hotel. This made his total payment to Hotel $43,000. Later in October 1955, petitioner requested Hotel to return his money. Petitioner was doing a significant amount *165 of defense work and he felt that it would hurt his reputation if it were known that he was associated with gambling. Hotel agreed to return petitioner's money but indicated that petitioner would have to wait. Shortly thereafter Hotel refunded $20,000 to petitioner, leaving $23,000 due and owing him. On April 18, 1957, petitioner filed suit in a Nevada court against Hotel for the return of his $23,000. Hotel filed bankruptcy proceedings in the Federal District Court of the District of Nevada in May 1957. Petitioner thereafter did not pursue his civil suit as he deemed it uncollectible. No part of the $23,000 represents a "theft" loss. Petitioner in connection with his business ventures was required to travel and entertain business associates during the year 1956. Petitioner did not keep accurate records of his travel and entertainment expenses and his recollection of the amounts spent was vague. No records of any sort were submitted to this Court to verify the amounts spent. During the year 1956 petitioner owned a yacht. Petitioner testified that he used the yacht for business purposes but did not supply the names of the individuals entertained on the yacht, the number of such individuals, *166 or the number of times the yacht was used for business purposes. On this record, petitioner is not entitled to a deduction for travel, entertainment, and yachting expenses in excess of the amounts allowed by respondent. Opinion Issue 1. Ordinary Income - Capital Gain This issue, which is purely a factual one, involves a determination as to whether any part or all of the additional $200,000 payable to petitioner pursuant to the March 23, 1956, agreement above the amount payable to petitioner pursuant to the October 7, 1955, agreement was for a covenant not to compete and/or cancellation of an employment contract. [2] Petitioner claims that the additional $200,000 was paid in consideration of his agreeing to discontinue the suit to rescind the October 7, 1955, agreement. The argument is then made that a payment of this nature can be treated only as a payment for the stock itself. Respondent, on the other hand, takes the position that all or at least part of the $200,000 was paid to petitioner in return for his giving a covenant not to compete or for his agreeing to the cancellation of his employment contract. We agree with petitioner. *167 Whether any portion of the sales price of stock should be attributed to a restrictive covenant as opposed to other items in the transaction depends upon whether the parties treated the covenant as a separate and distinct item in their negotiations and whether the purchaser actually paid anything for the covenant as a separate item in the transaction. Lee Ruwitch, 22 T.C. 1053 (1954); Gazette Telegraph Co., 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954); George H. Payne, 22 T.C. 526 (1954); Merle P. Brooks, 36 T.C. 1128 (1961); Edward A. Kenney, 37 T.C. 1161 (1962); Andrew A. Monaghan, 40 T.C. 680 (1963). The mere existence of a covenant not to compete in a contract does not necessarily mean that some part of the consideration was paid for it. Merle P. Brooks, supra; Aaron Michaels, 12 T.C. 17 (1949). Resort must be had to the entire transaction to see what the parties bargained for. Although we are compelled to examine all the facts and circumstances to determine the realities of the transaction, the written terms embodied in the contract of March 23, 1956, are *168 of prime importance in determining the intent of the parties. This Court will not rewrite contracts entered into by unrelated parties dealing at arm's length without convincing evidence that the contracts as written do not represent the true agreements of the parties. Edward A. Kenney, supra. It is apparent from this record in the light of the aforementioned authorities that the covenant not to compete was never actually dealt with, never bargained for, and never evaluated as a separate item in the agreement. The record before us shows that petitioner as the seller, and Hill and Bell representing Avi-Air as the buyer, were unrelated parties. After negotiations, an agreement of sale was executed on October 7, 1955, whereby petitioner sold his stock in Tapered and Aero to Avi-Air for $1,150,000. In view of the fact that the main assets of both corporations whose stock was being sold consisted of machinery and equipment designed by petitioner, and in view of the fact that the employees of both corporations were men hand picked and trained by petitioner, Avi-Air wanted the services of petitioner at least for a short period of time. Accordingly, a separate employment *169 contract was entered into whereby petitioner was to receive $18,000 a year for a period of eight years. A covenant not to compete was contained in the employment contract. However, it is clear from the record that it was the services of petitioner which were of vital concern to Avi-Air and not the covenant against competition. Simultaneously with the sales agreement, additional collateral agreements were entered into between petitioner and Avi-Air, the important ones having been set forth in our Findings of Fact. Subsequently, differences arose between petitioner and Hill. The main concern of petitioner was the fact that Avi-Air borrowed funds from Tapered to make the down payment to petitioner and the minority stockholders of Tapered, thereby reducing the working capital of Tapered and jeopardizing the security of petitioner's promissory note. Petitioner felt that certain misrepresentations were made to him by Hill and Bell whereby he was induced to enter into the sales agreement by fraudulent means. Petitioner refused to continue performing under the employment contract and instituted a civil suit to rescind the October 7 agreement. Because Tapered and Aero were closely held corporations *170 performing work in a limited area, a large portion being defense work, it was felt by both petitioner and Avi-Air that a continuation of the suit might bring disastrous results to both sides. With this in mind, petitioner contacted Hill for the purpose of arranging a meeting to discuss their disagreements. This meeting took place in early March 1956 and was attended by only petitioner and Hill. At the meeting, which lasted approximately one hour or more, it was agreed by both participants that an additional sum of $200,000 would be paid to petitioner if he would have the suit to rescind the October 7, 1956, agreement dismissed. No mention was made at this conference of the employment contract nor was the subject of a covenant not to compete discussed. The matter of reducing the parties' agreement in writing was left to their respective attorneys. Petitioner, in discussing the matter with his attorney, indicated that because of the emotion created over this incident he did not want to continue as an employee of Avi-Air. He authorized his attorney to cancel the employment contract. Hill, in discussing the agreement with his attorney, indicated his desire to have petitioner continue *171 as an employee or at least as a member of the board of directors. The record indicates that it was Hill's attorney who wanted the employment contract with petitioner cancelled and it was at this time that the question of a covenant not to compete was first discussed by the purchaser. Eventually, on March 23, 1956, a new agreement was entered into by petitioner and Avi-Air whereby the selling price of petitioner's stock was increased by $200,000. The employment contract was cancelled and a covenant not to compete was inserted in the agreement. The parties did not assign, in the agreement, any value to the covenant not to compete nor was any separate value for the covenant ever agreed to. The agreement itself states: "The increase in said purchase price above that set on October 7, 1955 represents an amount paid or to be paid solely to secure and quiet title in Avi-Air to said capital stock." If the parties did not place any independent value on the covenant not to compete, we cannot ascribe any value to it. [3]Edward A. Kenney, supra. We find nothing in the record before us to indicate that the $200,000 was payable for anything other than as stated in the agreement. *172 Edward A. Kenney, supra.No separate value having been agreed to for the covenant and no value being incorporated in the agreement for the covenant lead us to the conclusion that the parties did not intend to allocate any part of the purchase price to the covenant not to compete. Andrew A. Monaghan, supra; George H. Payne, supra.
Respondent argues that substance and not form must control the incidence of taxation, citing Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953), for that proposition. We agree with the principle but do not agree that, in this case, the substance is any different than the form. In Hamlin's Trust, supra, where stock was sold, a separate value was placed on the covenant not to compete by the parties after negotiations on this point. But this Court and the Court of Appeals found that the covenant was severable, that the parties dealt with it separately, and that the amount *173 received for the covenant was specified and thereby ascertainable. However, the facts in this case are materially different from the facts in Hamlin's Trust. Here the price of $200,000 was agreed upon before the parties thought of a covenant not to compete. Furthermore, it was Hill's attorney who decided upon a covenant not to compete. "Coming as it did after the price had been fixed it can hardly be taken as being a part of the bargained-for consideration." Merle P. Brooks, supra. Respondent argues that part of the $200,000 should be allocated to the cancellation of the employment contract. The record does not support such a contention. On the contrary, we are convinced that it was petitioner who wanted to cancel the contract while Hill still wanted and needed his services. It does not seem logical to us, that under this circumstance, Hill would agree to pay petitioner anything to cancel the employment contract. We hold that on the facts of this case no part of the $200,000 in issue was paid to petitioner for a covenant not to compete and/or the cancellation of his employment contract. The respondent does not challenge the fact that if the $200,000 was offered *174 in consideration of the dismissal of petitioner's suit the income tax consequences would be determined by the nature of the grounds of the action which was thereby settled. Albert J. Goldsmith, 22 T.C. 1137 (1954); Margery K. Megargel, 3 T.C. 238 (1944). Since the basis of petitioner's suit was the claim that the October 7, 1955, agreement for the sale of his stock was induced by fraud and should therefore be rescinded, any payment resulting from a setlement of such suit would result in capital gain. Albert J. Goldsmith, supra; Rose Marie Reid, 26 T.C. 622 (1956). Accordingly, having found that the $200,000 in question was to be paid in return for petitioner's withdrawal of his rescission suit, he is entitled to capital gains treatment. Issue 2. Interest Income In connection with the October 7, 1955, agreement, a collateral agreement was entered into whereby petitioner agreed to be responsible for 90 percent of any Federal corporate and/or State income taxes that might be due and owing by Tapered and Aero for the fiscal years ended on or before July 31, 1955. The agreement further provided that the amounts which petitioner *175 might owe "shall be paid and deducted by Avi-Air out of the interest payments due to Thompson" on the promissory note executed at the time of sale. This provision of the collateral agreement was incorporated into the agreement of March 23, 1956, the terms of which have been set forth in our Findings of Fact. Once the tax liability was determined, Avi-Air was not required to make any interest payments thereafter falling due to petitioner until such time as the said liability was discharged. During 1960 Avi-Air paid a tax deficiency determined against Tapered for the fiscal year ended July 31, 1955. Of the amount paid, $7,767.87 represented the amount to be borne by petitioner pursuant to the March 23 agreement. Accordingly, Avi-Air reduced the amount of interest payable to petitioner by $7,767.87. Petitioner, a cash basis taxpayer, maintains that the payment of the sum in issue by Avi-Air was, in effect, a reduction of the interest due petitioner under the terms of the agreement. Respondent claims that petitioner realized additional ordinary income during the year 1960 via his constructive receipt of interest income in the amount of $7,767.87. In the alternative, respondent argues *176 that petitioner is taxable on the subject amount as ordinary income on the theory of anticipatory assignment of interest income. [4] We agree with petitioner. It is well settled that parties to a transaction can cast their transaction in whatever form is most advantageous to themselves. Arthur J. Kobacker, 37 T.C. 882 (1962); Albert W. Badanes, 39 T.C. 410 (1962). We have had numerous occasions to reiterate the rule that the doctrine of constructive receipt is to be sparingly applied and is to be invoked only in unique circumstances and in a clear case. Estate of Harry Snider, 39 T.C. 341, 348 (1962). If the agreement of the parties provided that the purchaser could without part of the purchase price and apply it toward the payment of taxes required to be borne by the petitioner, there is no doubt that this would not constitute a constructive receipt of part of the purchase price by petitioner. Preston R. Bassett, 33 B.T.A. 182 (1935), affd. per curiam 90 F. 2d 1004 *177 (C.A. 2, 1937); Stoner v. Commissioner, 79 F. 2d 75 (C.A. 3, 1935), reversing 29 B.T.A. 953 (1934); [5]Commissioner v. Cleveland Trinidad Paving Co., 62 F. 2d 85 (C.A. 6, 1932), affirming 20 B.T.A. 772 (1930). Then the question is whether the results should be any different because the parties agreed that the amounts to be used to pay the taxes should come from the interest payments on the promissory note. We think not. Petitioner never had control or possession of the interest payment, nor was he sure how much interest he would receive. His right to the interest was subject to a substantial contingency. If the taxes materialized, as they in fact did, the interest did not belong to petitioner. Petitioner lacked the ultimate incident of ownership, to wit, the right to demand and collect the interest and use it as he saw fit. Under these facts, we cannot say that he had an unlimited command or even qualified control over the interest until it was actually received by him. Accordingly, petitioner did not constructively receive any interest by virtue of the payment by Avi-Air of Tapered's tax liability. P. T. Clary, 42 B.T.A. 1142 (1940); *178 Morris Cohen, 39 T.C. 886 (1963); Marion H. McArdle, 11 T.C. 961 (1948). We could only be justified in finding constructive receipt under the facts of this case if we found that the agreement between petitioner and Avi-Air of March 23, 1956, was a sham and mere subterfuge for the purpose of avoiding taxes. Cf. Margaret L. Carpenter, 34 T.C. 408 (1960). However, we are convinced that the dealings between the parties were at arm's length and not a mere subterfuge. This case is not unlike the case of Morris Cohen, supra. In the Cohen case, the taxpayer agreed to sell his stock in DOM. The purchase price was $1,282.344. The taxpayer agreed to put in a sewer line at his own expense. Subsequently, the buyer agreed to build the sewer line and it was agreed that the cost be deducted from the sales price of the stock. The cost was $74,220.26. *179 The Commissioner in that case argued for constructive receipt of the $74,220.26. We held that the $74,220.26 was not constructively received by the taxpayer and stated, at page 893: It seems obvious that the buyer would have insisted upon a corresponding reduction in the purchase price of the stock if the agreement had not required the sellers to pay for the connecting sewer main. The best solution of this problem would seem to be that the later agreement between the parties, shifting the sewer construction to the buyer, was a modification of the original contract under which the purchase price was reduced as the petitioners contend. * * * It is obvious to us that the very same situation is present in the proceeding before us. If petitioner did not agree to having part of the interest payment applied to the taxes of Tapered, the purchaser would have demanded a reduction in the purchase price to the extent of the taxes. The result should not be any different because the parties handled the situation the way they did. Morris Cohen, supra; Marion H. McArdle, supra. For the same reasons, the respondent's reliance on Helvering v. Horst, 311 U.S. 112 (1940) *180 and the theory of anticipatory assignment of income are improper in this case. It suffices to say that petitioner never had a right to the $7,767.87 in question. Petitioner's right to a payment of interest was contingent upon the nonexistence of any taxes due and owing by Tapered. If at the time any interest payments became due Tapered owed taxes, petitioner did not have a right to an interest payment. Petitioner did not realize any income and the payment of Tapered's taxes by Avi-Air out of the withheld interest payment was not an anticipatory assignment of income. Cf. Estate of Florence E. Carr, 37 T.C. 1173, 1179 (1962). There can be no anticipatory assignment of income unless, at the time of assignment, the assignor is entitled to receive the income and his right to receive the income is vested. Harrison v. Schaffner, 312 U.S. 579 (1941). Petitioner did not have a vested right to receive the interest under the terms of the March 23, 1956, agreement. His right was contingent. Where there has been no possession and where the right to possession is contingent, there can be no disposition or anticipatory assignment of income. Cf. Paul A. Teschner, 38 T.C. 1003 (1962). *181 Issue 3. Theft Loss. In 1955 petitioner was approached by representatives of Hotel relative to petitioner making an investment in said corporation. Hotel was organized to operate a gambling casino in Las Vegas, Nevada. It was agreed that petitioner would subscribe to 1.60 shares of stock at the price of $2,500 per share and would loan the corporation $31,000, for a total investment of $35,000. The subscription agreement given to petitioner by Hotel called for a deposit of the purchase price of the stock and the amount of the loan immediately upon execution of the agreement. On May 26, 1955, petitioner delivered his check to Hotel for $35,000. On October 18, 1955, for some reason not explained in the record, petitioner delivered another check to Hotel in the amount of $8,000. Although the record is not clear, it appears that subsequent to the delivery of the second check petitioner contacted the representatives of Hotel with the aim of having his money returned. Since it would be necessary for petitioner to be licensed by the Nevada Tax Commission as a gambling licensee and since petitioner did defense work, he decided that it would be better to terminate his association with Hotel. *182 After requesting the return of his $43,000, petitioner was informed that he would receive his money but that it would take a little time. Petitioner, prior to April 18, 1957, received a return of $20,000. On April 18, 1957, petitioner filed suit in Nevada against Hotel to recover the remaining $23,000. Hotel filed bankruptcy proceedings in May 1957. In view of this, petitioner did not press his suit against Hotel. On these facts and these facts alone, petitioner claimed a theft loss for the $23,000 in the nature of embezzlement. Respondent maintains that a theft loss has not been shown on this record. We agree with respondent. Petitioner has the burden of showing that the facts of the case warrant a conclusion that a theft took place. Mary Frances Allen, 16 T.C. 163 (1951); Bonney v. Commissioner, 247 F. 2d 237 (C.A. 2, 1957), affirming 24 T.C. 199 (1955), certiorari denied 355 U.S. 923 (1957). As we stated in Mary Frances Allen, supra: If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, *183 the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden. Whether a theft loss has occurred, for tax purposes, depends upon the law of the jurisdiction where the loss occurred. Edwards v. Bromberg, 232 F. 2d 107 (C.A. 5, 1956); Michele Monteleone, 34 T.C. 688 (1960). The exact nature of the loss, whether caused by larceny, false pretenses, embezzlement, or other form of swindling is not important. Edwards v. Bromberg, supra; Curtis H. Muncie, 18 T.C. 849 (1952). While a conviction of theft is not necessary to sustain a loss deduction, Paul C. F. Vietzke, 37 T.C. 504 (1961), the absence of a convictin or the absence of any evidence indicating that a conviction was obtained may indicate that a theft loss did not in fact occur. Arcade Realty Co., 35 T.C. 256 (1960). Petitioner maintains that the taking of his money and the use of it by Hotel constitute embezzlement. Whether we look to the law of California[6] or the law of Nevada[7] for the definition of embezzlement, we find that one of the necessary elements *184 is the criminal intent. People v. Proctor, 169 Cal. App. 2d 269 (1959), 337 P. 2d 93. Fraudulent intent is a necessary element of embezzlement. People v. Scholder, 143 Cal. App. 2d 836 (1956), 300 P. 2d 384. This record is totally devoid of any evidence to show that the mere failure of Hotel to be able to refund all of petitioner's investment was part of a scheme whereby Hotel fraudulently appropriated the property of petitioner. We cannot assume this crucial fact without proof. Evelyn Nell Norton, 40 T.C. 500 (1963). The mere violation of a trust does not constitute the fraudulent appropriation which is necessary to constitute embezzlement by theft. People v. Whitney, 121 Cal. App. 2d 515 (1953) 263 P. 2d 449. The nonperformance of a promisor is not enough to constitute a fraudulent pretense unless a showing is made that the promise was made with the intent not to perform. People v. Otterman, 154 Cal. App. 2d 193 (1957), 316 P. 2d 85. The mere allegation of fraud by petitioner in his suit filed in Nevada is not sufficient to establish *185 a theft loss in either California or Nevada. The record is silent as to whether Hotel or any of its officers and/or stockholders were criminally indicted or convicted. We can only assume that if there were any criminal proceedings brought against these parties it would have been brought to our attention. Arcade Realty Co., supra.The absence of such evidence together with the facts disclosed by the record clearly indicates that petitioner has failed to carry his burden of proving that a theft took place. Arcade Realty Co., supra; Mary Frances Allen, supra; Henry C. Taylor, 34 B.T.A. 241 (1936). Furthermore, petitioner is silent as to why he gave Hotel an additional check for $8,000 when he already had paid the amount required under the subscription agreement. The $8,000 was given five months after the first check. This indicates to us that petitioner was aware of the use of his funds by Hotel and consented thereto, which negates any criminal offense. Franklin Mills, 28 B.T.A. 218 (1933). Issue 4. Travel, Entertainment, and Yacht Expenses Petitioner, on his income tax return for the year 1956 claimed deductions *186 for travel, entertainment, and yachting in the respective amounts of $1,481, $1,625, and $1,460. Respondent disallowed $781 of the travel expense, $825 of the entertainment expense, and all of the yachting expense. Petitioner maintains that respondent erred in disallowing any of his claimed deductions. Respondent, on the other hand, argues that the present record does not warrant the allowance of any deductions in excess of what he has already allowed. We agree with respondent. At the trial of this case, petitioner's accountant testified relative to the claimed expenses. He stated that the entertainment and travel deductions were based solely on estimates, that there were never any records kept by petitioner relative to his travel and entertainment expenses. Regarding the yacht, the accountant testified that petitioner never identified the people who were entertained aboard the yacht; nor do we know the number or purpose of the trips made by the yacht. All of the expenses in connection with the yacht were estimates. The accountant testified that petitioner did not disclose the names of the people entertained on the yacht because they were connected with the aircraft industry. Petitioner *187 testified that he refused to mention the names of the persons utilizing the yacht because they might lose their jobs. Petitioner wants this Court to invoke the so-called Cohan rule ( Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930)), and allow the claimed deductions. The respondent has already applied the Cohan rule and has done so generously in petitioner's favor. Petitioner wants this Court to, in effect, apply the Cohan rule a second time. Petitioner has failed to introduce any evidence that he made expenditures for such business expenses in an amount larger than respondent has already approximated. It is clear that respondent had basically the same information as has been given this Court when he made his determination and could not verify any of the claimed deductions of petitioner. The latter's mere reiteration on the witness stand does not give his vague and general claims any greater weight. There is no proof upon which this Court can base a different or greater approximation than respondent has already made. H. Collings Downes, 30 T.C. 396 (1958); Neils Schultz, 44 B.T.A. 146 (1941). Furthermore, the persons entertained aboard petitioner's *188 yacht may have been public officials. Amounts spent for the entertainment of public officials who may have a direct or even indirect relation to contracts which petitioner might be seeking are, generally speaking, not proper business expenses. Raymond F. Flanagan, 47 B.T.A. 782 (1942). In addition, petitioner testified that as a director of Tapered he would have received reimbursement for expense incurred in entertaining clients of Tapered if he had claimed it. To the extent that he could have been reimbursed, the expenditures made were not ordinary and necessary expenses of his business. William C. Stolk, 40 T.C. 345 (1963), affd. 326 F. 2d 760 (C.A. 2, 1964); Horace E. Podems, 24 T.C. 21 (1955). Accordingly, we approve of respondent's determination. In view of our holdings on the issues presented and to reflect certain concessions made by the parties. Decision will be entered under Rule 50. Footnotes
1. Sometime after October 7, 1955, but before February 3, 1956, Avi-Air changed its name to Tapered and had Tapered's name changed to Jagett, Inc. Since the changes of names are not material to the issues before us, we will continue to refer to the corporations by their original names.↩
2. Whether the payments are deemed to be for the covenant not to compete or for the cancellation of the employment contract, they would, in both cases, be taxable to petitioner as ordinary income.↩
3. Both petitioner and Hill (the purchaser) testified that no discussion of a covenant not to compete took place between them at their meeting early in March 1956.↩
4. The evidence submitted and the arguments made by the parties on this issue were limited to whether the $7,767.87 constituted, in its entirety, interest income.↩
5. This Court, in Preston R. Bassett, 33 B.T.A. 182 (1935), affd. per curiam 90 F. 2d 1004 (C.A. 2, 1937), decided to follow the Court of Appeals' opinion in Stoner v. Commissioner, 79 F. 2d 75 (C.A. 3, 1935), reversing 29 B.T.A. 953↩ (1934).
6. Sec. 503, Calif. Pen. Code↩. 7. Sec. 205,300, Nevada Revised Statutes.↩