RIMM, J.T.C.
This case is before the court on stipulated facts and oral argument. Plaintiff, Stella A. Schaevitz Trust, appeals a final determination of the defendant, Director, Division of Taxation, dated September 21, 1992, denying a refund of New Jersey Gross Income Tax for the 1987 tax year in the amount of $9,363 plus interest. There are two issues before the court: (1) does the Director have the authority to review an Internal Revenue Service (“IRS”) determination; and (2) what is the basis for stock sold when part of the purchase price is withheld pending a review of business results?
I
On or about December 19, 1986, Schaevitz Engineering (“SE”), a New Jersey corporation, merged with a wholly owned subsidiary of Lucas Industries, Inc. (“Lucas”), a Michigan corporation, as set forth in a Proxy Statement. SE was the surviving corporation. The terms of the merger agreement provided that each share of *300 SE common stock was converted into the right to receive up to a maximum of $27.34 in cash, subject to an escrow or holdback of $4.74961 per share. Article I, § 1.03, of the merger agreement provided that, “[t]he first installment with respect to each Share shall be equal to the Per Share Amount less $4.74961____” Article I, § 1.01, of the merger agreement provided the formula used in determining the total “Per Share Amount,” or the purchase price to be paid by Lucas. Pursuant to the agreement, approximately $22.59 per share was paid to SE shareholders upon surrender of their stock certificates.
Approximately $5,000,000 of the purchase price was deposited with an escrow agent. The payment of the escrow portion of the purchase price was contingent upon SE achieving an adjusted, consolidated net income before taxes of $3,000,000 for the 15 month period ending March 28, 1987. Article VI, § 6.03, of the merger agreement provided for a reduction in the purchase price based upon the amount of shortfall of the adjusted, consolidated net income goal. Annex D to the merger agreement, Part A at D-1, entitled “Procedures for Adjusted Income Statement,” provided in part as follows:
The overriding principle and intention is that the adjusted consolidated income before taxes for the 15 month period ending 28 March 1987 represents a true and fair result for the period under review incorporating all normal recurring expenses ____ [lit is agreed that the Company [SE] will not take any steps to inflate sales and/or profit before taxes by any of the following actions:
(1) Shipping or selling ahead of customer requirements during the period under review;
(2) Deferring expenditures relative to the period until the following period;
(3) Increasing inventory so as to increase overhead burden recovered in inventory except in the normal course of business;
(4) Changing the existing method of applying burden rates to inventory valuation; or
(5) Any other means or device outside normal, historic business practice.
At the time of the merger, there were 1,052,719 shares of SE common stock. Plaintiff owned 357,570 shares or 33.97% of SE common stock immediately prior to the merger. Stella A. Schae-vitz and A. Robert Schaevitz, also known as Abraham R. Schae-vitz, as co-executors and co-testamentary trustees of the estate of Herman Schaevitz, deceased (the “estate”), owned 270,875 shares *301 or 27.72% of SE common stock. The beneficiaries of both plaintiff and the estate are Howard Schaevitz and Phyllis Howard. Individually, Howard Schaevitz owned 12,001 shares or 1.14%, Stella Schaevitz owned 88,891 shares or 8.44%, and A. Robert Schaevitz owned 13,174 shares or 1.25% of SE common stock. SE’s Employee Stock Ownership Plan (“ESOP”) held 169,210 shares or 16.07% of SE common stock. The balance of the shares were owned by various minority shareholders.
As the March 28, 1987 consolidated net income deadline approached, SE’s consolidated net income was falling short of the mark. Consequently, in order to increase SE’s consolidated net income, Stella Schaevitz, Howard Schaevitz and Phyllis Howard (hereafter collectively referred to as “shareholders”) arranged to purchase certain “slow- and non-moving” inventory. A section of the merger agreement, entitled “Inventory Write-offs and Write-downs” defines “slow- and non-moving inventory.” The shareholders caused Measurement Systems and Sales, a corporation over which they had control, to effectuate the purchase on their behalf; and transfers were made from the personal accounts of the shareholders to Measurement Systems to provide funds for the purchase.
The purchase price of the inventory totalled $525,100. After the purchase, the inventory was stored in the garage of one of the shareholders. In 1987, following an audit called for in the merger agreement, $2.8497633 per share was released from escrow and paid to all the former SE shareholders.
On April 15, 1988, plaintiff filed a New Jersey Gross Income Tax Fiduciary Return, Form NJ-1041, for the 1987 tax year (the “1987 return”), reporting a net gain of $1,019,003.00 on the sale of 357,570 shares of SE stock. The stock had a zero cost basis to plaintiff for the payment from the escrow account. For 1987, the plaintiff reported and paid to New Jersey, tax in the amount of $37,753.
Late in 1989, representatives of Lucas discovered that the shareholders had purchased the inventory from SE, and they claimed that the purchase was in violation of the merger agree *302 ment. Lucas threatened to sue the shareholders if its demands were not met. The parties, after negotiation, arrived at a settlement. The settlement provided for the refund to Lucas of the escrow funds erroneously released to the “Schaevitz Family” to the extent of $200,000. According to the agreement, the “Schae-vitz Family” did not include plaintiff. The settlement payment terms were as follows:
At the Closing, [Howard A.] Schaevitz, for himself and on behalf of the Schaevitz Family, shall pay to the Company [SE], by cash, cashier’s check or same day funds, the sum of $200,000 (the “Settlement Payment”) as a refund of a portion of the conversion price paid by or on behalf of the Company for conversion of the Company stock pursuant to the Merger Agreement.
Neither party to this litigation has indicated whether this obligation was fulfilled. However, plaintiffs amended return does not indicate that plaintiff contributed to this refund, if made.
The settlement agreement also provided that the “Schaevitz Family” return the inventory to SE without further consideration. In accordance with this agreement, on October 6, 1989, Stella Schaevitz, Howard Schaevitz and Phyllis Howard executed a bill of sale for the inventory. With respect to the bill of sale, the three warranted that:
(1) the inventory is in the possession or control of Howard A. Schaevitz, Stella A. Schaevitz and Phyllis C. Howard and has not been sold to any third party; and
(2) the signatories to the Bill of Sale, Howard A. Schaevitz, Stella A. Schaevitz and Phyllis C. Howard have good and marketable title to the Inventory, free and clear of restrictions on or conditions to transfer or assignment, and free and clear of any liens, security interests, pledges, charges, equity claims, covenants, conditions or restrictions, except those claims which may be held by the company and Lucas and which shall be released as provided herein.
Sometime in 1989, after the inventory had been returned to SE, plaintiff paid a portion of the inventory purchase price to Stella Schaevitz in the amount of $111.51; to Howard Schaevitz in the amount of $128,413.35; and to Phyllis Howard in the amount of $128,413.35. There is no evidence of a formal agreement on the part of plaintiff to reimburse the family members. Plaintiffs attorney has indicated that he was not aware of any formal agreement; that it was most likely assumed that plaintiff would contribute to the purchase; and that no formal agreement was necessary because the shareholders essentially controlled plaintiff.
*303 On May 18, 1990, plaintiff filed an amended U.S. Fiduciary Income Tax Return, Form 1041, for the 1987 tax year (“amended federal return”). Line 6 of the amended federal return reported a total capital gain of $310,513. Schedule D, “Capital Gains and Losses,” provides the details of the SE stock sale, reporting a gross sales price of $1,019,003, a cost basis of $267,533 and a resulting long-term capital gain of $751,470. The amended return claimed a refund in the amount of $56,167. Plaintiff did not seek a reduction in the amount received in payment for the stock based on the refund of the $200,000 pursuant to the settlement agreement.
On audit, the IRS was originally disinclined to allow the refund claim. On October 25, 1991, in a letter to plaintiffs accountant, the IRS examiner assigned to the case wrote that “the settlement of the prospective lawsuit between Lucas and the Schaevitzs’ was independent of, and unrelated to, the Lucas-Schaevitz purchase escrow agreement.” The text of the letter is set forth in full:
I discussed the above case with the Group Manager this date. After sorting through all the ins and outs, twists and turns, we come to the conclusion that the settlement of the prospective lawsuit between Lucas and the Schaevitz’ was independent of, and unrelated to the Lucas-Schaevitz purchase-escrow agreement. The lawsuit was based upon Howard’s civil, or possible criminal, attempt to fraudulently circumvent the escrow agreement, not upon any failure of sales to measure up to anticipation. This being the case there would be no grounds for adjustment to the basis as set forth in the amended 1041. To rule otherwise would be to reward the taxpayer for his fraud with a refund of income tax. Needless to say, we wouldn’t want to put ourselves in this position. Do you agree?
On November 14, 1991, the same examiner concluded that the threat of lawsuit was the “reason behind the settlement and the reimbursement of funds paid pursuant thereto.” The text of this letter is also set forth in full:
In response to yours of Nov. 6, if the settlement hadn’t taken place and if a complaint would have been filed, it would have been filed setting forth various counts. The first count, as you indicated, would have been for breach of contract on the escrow agreement. The second count would have involved a tort action involving civil and/or criminal fraud. No plaintiffs counsel of any competence would draft a complaint based solely on a breach of contract count given the facts and circumstances in this case.
Clearly, therefore, the plaintiff would have had a cause of action grounded in fraud, which would have been the overiding impetus that were to ensue as a result of Hov/ard’s actions.
*304 In conclusion, this “dominating” force is the reason behind the settlement and the reimbursement of funds paid pursuant thereto. We must, therefore, recommend disallowance of your refund claim accordingly. If you are in accord with this, please have enclosed Form 3363 executed and returned. If not, please advise and we will close case unagreed. In either event, we thank you for your courtesy during the course of the audit.
However, on December 26, 1991, without further explanation and despite his prior correspondence, the IRS examiner permitted plaintiff to amend its basis in the SE stock and allowed the requested refund. In particular, Form 4549, entitled “Income Tax Examination Changes,” reflects: at Line 1(a), a capital gain reduction in the amount of $267,533, the reduction representing basis in the SE stock; at Line 3, a corrected adjusted taxable income of $250,740; at Line 8, a corrected tax liability of $142,240; and at Line 18, an overpayment in the amount of $56,167.
Concurrent with its filing of an amended federal tax return, on May 22, 1990, plaintiff filed an amended Gross Income Tax Fiduciary Return, Form NJ-1041, for the 1987 tax year (the “amended return”), reporting a gain of only $751,470 on the sale of SE stock, and requesting a refund in the amount of $9,363. The reduction in net gain was the result of the plaintiffs reporting the stock as having a cost basis of $267,533. A statement attached to the amended return explained the circumstances of the stock sale, the inventory purchase, and the subsequent settlement agreement. With regard to the settlement agreement, the explanation was as follows:
The buyers and the sellers have agreed, without the admission of liability by any of them, that it is desirable to resolve these disputes without recourse to litigation.
The sellers, therefore, have agreed to and have returned to the company certain inventory which they had purchased from the company which had a tax basis in the hands of the seller of $267,533, making the original purchase of inventory from the company a nullity and reflecting that sum as cost against the receipt of the released escrow funds in that year.
Because this dispute related directly to the release of escrow funds in 1987, the tax return, Form 1041, for that year is being amended.
The cost basis of the stock was calculated as follows: plaintiff, the estate, Howard Schaevitz, and Stella Schaevitz collectively owned 729,337 shares or 69% of SE stock prior to the merger. Plaintiffs 357,570 shares constituted 49.0267% of that family total. *305 The inventory purchase price of $525,100 multiplied by 49.0267% equals $257,439, to which was added $10,094, plaintiffs share of legal and accounting expenses associated with the settlement.
The Director denied the requested refund by letter dated March 11, 1991, which was before the IRS examiner made his final determination. The denial was on the basis that plaintiff is a cash basis taxpayer and that the last two paragraphs on page ten of the Proxy Statement dictate the method to be used for reporting transactions involving the escrow funds.
The Proxy Statement outlines the possible tax consequences of the merger to the shareholders. As set forth below, the shareholders had the choice of taxation on a cash basis pursuant to the installment method, whereby their income would be taxed in the year of receipt; or, they could elect out of the installment method and be taxed in 1986 on the estimated total proceeds of the transaction.[1] The Proxy Statement explained this choice, in part, as follows:
Because the possibility of actual or constructive receipt by a Shareholder of some or all of the payment for his shares in 1986,1987 and 1988, since the escrow period may extend over as many as eighteen months, the year of inclusion of long or short-term gain in a Shareholder’s gross income for Federal tax purposes will depend, in part, on whether a Shareholder utilizes the installment method of reporting or elects out of the installment method____
Alternatively, an individual Shareholder could elect out of the installment method of reporting and include in gross income in the 1986 tax year the total gain attributable to conversion of such shares____
Plaintiffs accountant requested a hearing with the Division by letter dated June 6,1991. Following a phone conference between Division personnel and plaintiffs accountant, the Division issued a final determination, dated September 21, 1992, denying plaintiffs refund. The basis for denial of the refund is elaborated in the final determination but can be distilled down to the following statement: the purchase of the inventory was a separate transac *306 tion from the purchase and sale of SE stock, and the tax consequences of one transaction do not impact on the tax consequences of the other transaction.
The statutory provision at issue in this case is N.J.SA 54A:5-1, entitled “New Jersey Gross Income Defined”, and in particular N.J.SA 54A:5-l(c). N.J.SA 54A:5-l(c) provides, in pertinent part:
Net gains or income from disposition of property. Net gains or net income, less net losses, derived from the sale, exchange or other disposition of property, including real or personal, whether tangible or intangible as determined in accordance with the method of accounting allowed for federal income tax purposes. For the purpose of determining gain or loss, the basis of properly shall be the adjusted basis used for federal income tax purposes, except as expressly provided for under this act____
On appeal to the Tax Court, plaintiff argues that there is no dispute that it is entitled to a deduction for the sums it expended in purchasing the inventory. The question, it maintains, is simply whether that deduction is properly taken in 1987 in the form of an amended basis in the SE stock and a reduced gain on the sale of the SE stock, as it urges, or is properly taken in 1989 in the form of a loss on the “sale” of SE inventory, as the Division urges. Relying on N.J.SA 54A:5-l(e), plaintiff argues that since an amended adjusted basis in SE stock was accepted and used for federal income tax purposes for the 1987 tax year, it is entitled to amend its 1987 New Jersey Gross Income Tax Fiduciary Return, Form NJ-1041.
N.J.SA 5419:5~l(c), the Director argues, only requires the State to accept adjusted basis determined pursuant to federal tax. principles where those principles have been “correctly applied.” The Director contends, however, that the IRS examiner erred in allowing plaintiff to adjust its basis in the SE stock. Thus, the Director takes the position that plaintiff is not entitled to use for state tax purposes the adjusted basis it used for federal tax purposes. In support of its theory that the examiner erred, the Director argues the following: (1) the purchase and subsequent return of the inventory had no tax impact on plaintiff, because the actual purchasers of the inventory were individual family members, and it was they, not plaintiff, who returned the inventory in *307 accordance with the settlement agreement; and (2) even if plaintiff can be considered a purchaser of the inventory, the purchase price of inventory cannot be translated into an increased basis in an entirely different asset — the SE stock. As such, the Director argues that, as to the purchaser of the inventory, whoever that may have been, the return of the inventory in 1989 gives rise to a capital loss only deductible against income in that year.
II
The initial issue presented is one of interpretation of N.J.S.A. 54A:5-1. When interpreting a statute, courts should endeavor to give effect to the legislative intent as expressed by the language of the statute. State v. Nutter, 258 N.J.Super. 41, 609 A.2d 65 (App.Div.1992); State v. H.J.B., 240 N.J.Super. 216, 572 A.2d 1205 (Law Div.1990); State v. Diaz, 190 N.J.Super. 639, 464 A.2d 1216 (Law Div.1983). A statute
should not be read in isolation or in a way which sacrifices what appears to be the scheme of the statute as a whole. Rather a statute is to be interpreted in an integrated way without due emphasis on any particular word or phrase and, if possible, in a manner which harmonizes all of its parts so as to do justice to its overall meaning.
[Zimmerman v. Mun. Clerk of Tp. of Berkeley, 201 N.J.Super. 363, 368, 493 A.2d 62 (App.Div.1985).]
N.J.S.A 54A:5-1 sets forth the method for determining gross income for New Jersey purposes. One category of income included in New Jersey gross income is net gains or income derived from the disposition of property. N.J.S.A 54A:5-l(c) states: “For the purpose of determining gain or loss [from the disposition of property], the basis of property shall be the adjusted basis used for federal income tax purposes.....”
The Director does not dispute that N.J.S.A 54A:5-l(c) specifically instructs the use of adjusted basis calculated pursuant to federal tax principles in determining net gains for New Jersey purposes. He argues, however, that implicit in the mandate to use federal adjusted basis is the requirement that the adjusted basis used be correctly calculated under federal law. The Director contends that N.J.S.A. 54A:5-l(c) permits him and the Tax *308 Court to examine the basis used under the Act to determine if it is the correct basis used for federal tax purposes.
Plaintiff argues that the statutory language mandates the use of adjusted basis used for federal purposes. Since it used $267,533 as the basis of its SE stock, and since that basis survived the scrutiny of an IRS examiner, plaintiff must use that basis for state purposes, and the Director must allow it to do so. I conclude that the Director is correct.
The Legislature, when it incorporated federal principles into the New Jersey Gross Income Tax Act, N.J.S.A. 54A:1-1 to 10-12 (the “Act”), expected those principles to be properly applied by the federal government.
Plaintiffs argument that the Director must reach the same conclusion reached by the federal tax examiner in permitting the refund claimed from the IRS ignores the fact that the Director had no way of knowing what that conclusion was, because no reasoning is supplied for the allowance of the federal refund claim. The Director actually made his initial determination rejecting the refund claim prior to the allowance of the refund by the IRS. Judging by the doubts expressed by the IRS examiner, the refund allowance was not, in any event, the result of the application of clear-cut federal tax principles.
In enacting N.J.S.A. 54A:5-1(c), the Legislature could not have intended that, if a taxpayer uses a basis in reporting gain or loss on its federal tax return, the Director is obliged to accept that same basis when reported by a taxpayer for New Jersey Gross Income Tax purposes without further examination or audit. Such a construction of the statute makes no sense if it means that the Director is required to accept the taxpayer’s return where no federal examination of his taxes is made, or where, as here, there is an audit determination made by the IRS, but the basis of that determination is unclear or apparently incorrect. Statutory interpretations which lead to unreasonable or absurd results are to be avoided. Davis v. Heil, 132 N.J.Super. 283, 293, 333 A.2d 537 (App.Div.1975), aff'd, 68 N.J. 423, 346 A.2d 405 (1975). N.J.S.A *309 54A:5-l(c) must therefore be read to mean that the federal tax basis used by the New Jersey taxpayer is to be calculated pursuant to federal tax principles correctly applied.
Our courts have consistently approached the issue of determination of gain or loss on the disposition of property for purposes of the Act by reference to relevant federal tax principles. See Baldwin v. Director, Div. of Taxation, 10 N.J.Tax 273 (Tax 1988), aff'd 237 N.J.Super. 327, 567 A.2d 1021 (App.Div.1988) (Offset of personal loss against gain realized on a sale of residence is not permitted under federal tax law, and because N.J.S.A. 54A:5-1(c) incorporates federal income tax concepts, it will not be permitted for gross income tax purposes.); Smith v. Director, Div. of Taxation, 7 N.J.Tax 187 (Tax 1984), aff'd, 8 N.J.Tax 319 (App.Div.1986), aff'd, 108 N.J. 19, 527 A.2d 843 (1987) (Where the statute clearly permits it, federal tax principles do not prohibit the receipt of double tax benefits); Dubois v. Director, Division of Taxation, 4 N.J.Tax 11 (Tax 1981), aff'd, 6 N.J.Tax 249 (App.Div.1982) (New Jersey may tax receipts from a sale of property made prior to enactment of the New Jersey Gross Income Tax Act, where the seller has elected installment sales treatment for federal tax purposes and payments have been received after the effective date of the Act.); but see Walsh v. State, Dept. of Treasury, Division of Taxation, 10 N.J.Tax 447 (Tax 1989), aff'd and remanded, 240 N.J.Super. 42, 572 A.2d 222 (App.Div.1990) (Federal basis will be modified where federal tax law provides for adjustments to basis not recognized by New Jersey law.).
The overriding principle in each of these cases is that, except where, as in Walsh, supra, the New Jersey statute clearly indicates that New Jersey basis and federal basis are governed by different considerations, federal tax principles are to be applied for purposes of determining gain and loss under the Gross Income Tax Act. Application of federal principles to the determination of gain or loss is not, however, the same thing as accepting a taxpayer’s characterization of a transaction for federal income tax purposes. In Centex Homes v. Director, Div. of Taxation, 241 N.J.Super. 16, 17, 574 A.2d 448 (App.Div.1990), in the context of *310 the Corporation Business Tax Act, N.J.S.A 54:10A-1 to 54:10A-40, the court noted that the Division is not required to acquiesce in and blindly accept the label that a taxpayer places on a transaction.
The Director submits that, under federal law, the cost of the inventory purchased by individual family members cannot, in the absence of a transfer of that inventory to plaintiff, be regarded as a cost to plaintiff for any purpose whatsoever. Similarly, federal tax principles compel the conclusion that the purchase and transfer of inventory are not part of the same transaction as the acquisition and sale of stock by plaintiff warranting an adjustment to plaintiffs basis in the stock.
Because the refund requested is based on information contained in an amended return, N.J.S.A 54A:8-7 is pertinent to this issue. The section provides as follows:
If the amount of a taxpayer’s Federal taxable income reported on his Federal income tax return for any taxable year is changed or corrected by the United States Internal Revenue Service or other competent authority, or as the result of a renegotiation of a contract or subcontract with the United States, the taxpayer shall report such a change or correction in Federal taxable income within 90 days after the final determination of such change, correction, or renegotiation, or as otherwise required by the director, and shall concede the accuracy of such determination or state wherein it is erroneous. Any taxpayer filing an amended federal income tax return shall also file within 90 days thereafter an amended return under this act, and shall give such information as the director may require. The Director may by regulation prescribe such exceptions to the requirements of this section as he deems appropriate.
If, as plaintiff contends, the determination of basis by the IRS automatically fixes the basis to be used by the Director, there would be no reason for a taxpayer, involved in a change or a correction by the IRS to “concede the accuracy of such determination or state wherein it is erroneous.” This obviously contemplates that the taxpayer may, for state tax purposes, take a position different from the determination of the IRS for federal tax purposes. If the taxpayer can challenge the IRS determination, so too can the Director. Additionally, if the taxpayer files an amended federal return, he shall also file an amended state tax return, and “give such information as the Director may require.” Again, if the Director is required to accept the basis reported for *311 federal tax purposes, as plaintiff contends, there would be no reason for the Director to require information relating to an amended return.
In Specktor v. Commissioner of Revenue, 308 N.W.2d 806 (Minn.1981), the court dealt with a statute which defined “gross income” as the adjusted gross income as computed for federal income tax purposes. The court held that the commissioner of revenue could make his own investigation of the taxpayer’s return and adjust gross income accordingly, notwithstanding the federal government’s failure to make a comparable adjustment. The court noted that Minnesota tax statutes gave the commissioner the power to examine books and records, and to examine returns for correctness, which statutes would be a nullity if federal adjusted gross income were conclusive. The court added:
Under the tax court’s interpretation, if the federal adjusted gross income figure was the result of a mistake or even fraud, Minnesota would be powerless to correct the taxpayer’s return. We hold that Minnesota’s definition of gross income as federal adjusted gross income refers to the correct federal adjusted gross income.
[7d at 809.]
Similarly, in Okorn v. Dept. of Rev., 312 Or. 152, 818 P.2d 928 (1991), the court found no merit in the position of a taxpayer who, taking to its furthest extreme the state tax statute’s definition of taxable income as meaning taxable income under the Internal Revenue Code, contended that he could not be assessed at all by the state, since he had not filed federal returns or paid federal taxes, and had not yet been determined to be a federal taxpayer by federal authorities. The court stated that the legislature’s incorporation by reference was equivalent to its having republished the specified federal provisions in the state statutes, and that state law expressly gave the Department of Revenue the authority to administer and enforce state income tax provisions, including the incorporated federal provisions which, by Oregon statute, were to be administered in a manner consistent with federal administrative and judicial interpretations of the provisions at issue, “insofar as is practicable.” The court held that the Department had the authority to determine whether the taxpayer *312 had taxable income, and that its power to impose a deficiency assessment was not dependent on the IRS’s doing so.
A state taxing authority may examine and adjust state taxes that are to be construed in conformity with federal tax law, and such adjustments can be made to conform with federal tax principles correctly applied, notwithstanding the federal government’s own failure to do so.
The Director notes that, like the tax statutes in Specktor and Okorn, supra, the Act authorizes the Director to administer and enforce it, and to require such facts and information to be reported as he may deem necessary to enforce its provisions. N.J.S.A 54A:9-17(a). The Director is further authorized to examine books, papers, records or memoranda bearing on the matters to be included in the return. N.J.S.A 54A:9-17(c). N.J.S.A 54A:9-9(f) also permits the Director to establish rules for admission of a federal determination relating to issues raised in a case before the Director. The Director contends that the foregoing provisions indicate that a determination by federal taxing authorities is not conclusive.
Neither the taxpayer’s report of its basis on an amended federal tax return nor the acceptance of the amended return by the IRS examiner is binding on the Director or on the Tax Court. The amended federal return is not a dispositive statement of the applicable federal taxation principles involved in this case. The Act gives the Director ample authority to make a determination that the basis of property reported and used by a taxpayer for federal income tax purposes is incorrect and should be adjusted. The Director has the authority to determine that there was not an addition to basis in 1987 by virtue of the purchase of the inventory, but a disposition of the inventory in 1989, and that the loss should be reported in that year. Cf. Vinnik v. Director, Div. of Taxation, 12 N.J.Tax 450 (Tax Ct.1992) (Loss allowed for federal income tax purposes was not a disposition of property, and is not deductible under the Act.).
*313 III
In reviewing a taxpayer’s amended return, the Director must take care to apply federal law where it is applicable. In applying federal law, the Director may review, adjust, modify or reject federal tax determinations, if appropriate.
In Baldwin, supra, the statute at issue was N.J.S.A. 54A:5-l(c) and the language at issue was: “net gains ..., less net losses, derived from the sale ... of property ... as determined in accordance with the method of accounting allowed for federal tax purposes.” Id. at 283. Generally, personal losses are not deductible under federal law. The New Jersey statute, however, does not make a distinction between personal losses and other types of losses. The taxpayers, attempting to take advantage of this ambiguity, offset gain on the sale of their home with a personal loss incurred on the sale of a lawn tractor. On appeal from the denial on the offset, the taxpayers argued that the phrase “method of accounting allowed for federal tax purposes” should be interpreted to mean simply an accepted method of accounting such as the cash basis or accrual method. Based on this interpretation, the taxpayers argued that they were entitled to deduct their personal loss from the gain on the sale of their home so long as they did so consistent with the cash basis method. Id. at 283-84. The court rejected the taxpayers’ arguments finding that had the Legislature intended to deviate from federal principles, it would have explicitly done so. The court thus held that federal rules must be used to determine allowable gains or losses for New Jersey tax purposes. Id. at 285.
In Walsh, supra, the taxpayers realized a capital gain from the sale of their stock in an S corporation. At issue was the proper methodology for calculating the basis the stock for New Jersey purposes. The issue arose because the Act at the time made no distinction between S corporations and C corporations. The taxpayers reported a federal adjusted basis or cost basis reduced by passed-through corporate losses. For New Jersey purposes, however, the taxpayers reported a higher basis or a cost basis unreduced by corporate losses. The Director, citing N.J.S.A. *314 54A:5-1(c) reduced the taxpayers’ basis to the amount reported by the taxpayers for federal purposes. The taxpayers challenged the resulting deficiency assessment. They argued, among other things, that the Director’s computations ignored the economic reality of the transaction by taxing the taxpayers’ return of capital, and were improper because, since New Jersey does not recognize S corporations, adjusted basis for New Jersey purposes should not reflect passed through gains and losses. The Director maintained, however, that his computations were correct because N.J.S.A 54A:5-1(c) specifies that in determining net gain or loss from the disposition of property, federal basis shall be used for New Jersey purposes. Id. at 455-56. The court rejected the Director’s position holding that adjustments to federal adjusted basis arising from the passed-through gains or losses of a Sub-chapter S corporation must be excluded from federal adjusted basis under the Act because of the different treatment of such gains and losses. Id. at 462. See also, General Building Products Corp. v. Div. of Taxation 14 N.J.Tax 232 (Tax 1994), aff'd, 15 N.J.Tax 213 (App.Div.1995) (New Jersey does not allow consolidated returns, and the consolidation-dependent tax consequences of an I.R.C. § 338(h)(10) election could not be recognized for New Jersey tax purposes.).
IV
Plaintiff contends that the purchase of the inventory by plaintiff and the family members in 1987 was to avoid reductions in the payments they were to receive that year because of the failure to meet certain business goals that had been agreed upon when they sold their stock. According to plaintiff, the expenditure by it of $257,439 to purchase the inventory in 1987 had the effect of decreasing the gain realized by it on the sale of its stock by a like amount. Plaintiff contends that this reduction in plaintiffs 1987 gain, as well as $10,094 in legal fees plaintiff eventually paid as a result of the transaction, gave plaintiff a right to a refund. Plaintiff argues that the inventory purchase price, by virtue of the subsequent return of the inventory to Lucas, was converted into a capital contribution increasing the basis of the shareholders’ stock.
*315 Plaintiff cites Anderson v. Commissioner, 20 T.C.M. (CCH) 697 (1961), to the effect that where the taxpayer had sold stock in a corporation but his receipt of the sales proceeds was delayed under the sales agreement pending the determination of whether the corporation met certain performance goals, the federal income tax on the taxpayer’s capital gain would not be due until the taxable year in which the performance goals were acknowledged to have been realized and the taxpayer received the proceeds of the sale. The court considered the possibility that the taxpayer might receive a lesser sum from the buyer if the corporation was ultimately found to have failed to meet certain performance goals.
Plaintiff asserts that Anderson is analogous to the present case because the taxpayer’s gain on the sale of its stock was reduced by the sum it had to spend in 1987 to purchase the inventory in order to insure that the performance guidelines for the corporation would be met.
Plaintiff also relies on Rev.Rul. 80-119,1980-1 C.B. 40. In that case, the taxpayer had bought stock from a seller who later brought an action against him and threatened other actions arising from the sale of the stock. The taxpayer settled all claims with the seller by paying him a sum of money. The issue was whether the monies paid in settlement were deductible to the taxpayer as business expenses under I.R.C. § 162(a) or were non-deductible capital expenditures under I.R.C. § 263(a). Plaintiff states that this is analogous to its case, because defendant seeks to categorize the money paid for the inventory as a 1989 deductible expense while the taxpayer urges that it was part of the cost of the 1987 capital transaction.
The IRS determined in Rev.Rul. 80-119 that the entire out-of-court settlement was a capital expenditure because all of the claims it settled arose from the acquisition of a capital asset and that, accordingly, none of the settlement payments were deductible as business expenses. In reaching this conclusion, the IRS relied on various cases enunciating the “origin-of-the-claim” test as the proper method of determining whether a settlement payment is a capital expenditure or a deductible business expense. *316 In United States v. Gilmore, 372 U.S. 39, 49, 83 S.Ct. 623, 629, 9 L.Ed.2d 570, 577 (1963), the Supreme Court held that the “origin and character of the claim with respect to which an expense was incurred” will determine if costs of litigation were deductible business expenses. In Anchor Coupling Co. v. United States, 427 F.2d 429, 433 (7th Cir., 1970), cert. denied, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971), the Court held that a court must examine the origin and character of a claim with respect to which a settlement is made to determine if a settlement payment constituted a deductible business expense or a non-deductible capital outlay.
The origin of the claim rule requires the ascertainment of the kind of transaction out of which the litigation arose while considering all facts pertaining to the controversy. See Boagni v. Commissioner, 59 T.C. 708, 713 (1973).
Plaintiff says that to consider the purchase of the “slow-moving and non-moving” inventory by plaintiff and the family members or the return of the inventory to Lucas two years later for no consideration as individual isolated expenses, is contrary to the admitted facts of this case. Plaintiff argues that it did not incur the expense when it returned the inventory to Lucas in 1989. Plaintiff says that the inventory was always basically worthless to plaintiff except as a means of satisfying the corporate performance guidelines for 1987 to enable payment to be made to it in that year. The expense was incurred in 1987 when plaintiff contributed approximately $257,439, its pro rata share based on its percentage of stock ownership, toward the purchase of the inventory. Plaintiff asserts this should properly be treated as a reduction of the 1987 gain for the sale of the corporate stock.
V
According to defendant, the issue in this case is whether the purchase of the inventory in 1987 and its subsequent transfer in 1989 by individual family members constitute transactions separate and distinct from the sale of plaintiffs stock in 1986. Defen *317 dant asserts that they do and that the gain realized in 1987 by the trust was gain reportable in 1987 on its 1986 sale of stock.
Defendant argues that the inventory in issue was never purchased by the trust which cannot claim the cost of the inventory as the basis of its 1987 gain. If the purchase price of the inventory did not constitute basis for the gain as initially reported in 1987, the subsequent transfer to Lucas in 1989 did not convert it into basis for the 1987 gain. Alternatively, defendant contends that, even if plaintiff can be considered a purchaser of the inventory, a 1987 inventory purchase cannot be said to have increased the basis of an entirely different asset — the stock — that was sold in 1986. To defendant, the purchase of inventory in 1987 was a purchase of a capital asset whose basis was its purchase price. The asset was not inventory to the purchasers since it was not sold by them in the conduct of a trade or business, but was “kept in the garage of one of the family members after its purchase.” Defendant asserts that, as to the purchaser of the inventory, whoever that may have been, the return of the inventory in 1989 would give rise to a capital loss only deductible against income in that year.[2] The origin of the claim here was the allegedly wrongful purchase of the inventory, and not the initial acquisition of stock on which the gain was recognized by the trust.
Defendant notes that the trust has presented no evidence that it was the purchaser of the inventory in 1987. It was instead stipulated that the inventory was purchased by individual family members who are trustees or beneficiaries of the trust. The purchase was made by transfers of money from their individual accounts. Those individual family members warranted in the settlement agreement that they had possession or control of the *318 inventory and represented in the bill of sale, executed by them in their individual capacities, that they were the true and lawful owners of the inventory. It is defendant’s position that no money was expended by the trust in 1987 to purchase the inventory, and the trust simply cannot be deemed to have been the purchaser of the inventory in 1987 or in any other year. On October 16, 1989, when the individual family members were paid by the trust, the inventory had already been returned to Lucas by a bill of sale dated October 6, 1989. Without regard to whether that payment was a distribution from the trust, or was made pursuant to some informal arrangement among the family members, defendant asserts that no portion of the cost of the inventory can be attributed to the basis of the gain recognized by the trust in 1987. Defendant contends that in the absence of an actual transfer of an asset, a taxpayer may not arbitrarily assign monies expended in the purchase of an asset to the basis of another taxpayer.
Defendant suggests that while federal tax principles require a court to examine the origin and character of a claim with respect to which a settlement is made in order to determine if a settlement payment constitutes a deductible business expense or a nondeductible capital outlay, the authority cited by plaintiff in support of its position that the transfer of inventory in 1989 results in a change in the basis of its 1987 gain is however inapposite. Defendant emphasizes that even though a taxpayer may recognize gain on a sale of stock in the year in which it is actually received when the amount of the sale depends on performance goals, that does not mean that a transaction designed to manipulate those performance goals is integral to and a part of the stock sale transaction. Defendant’s position is that Anderson does not hold otherwise.
Defendant argues that the facts here are also distinguishable from those set forth in Rev.Rul 80-119, where it was alleged that the taxpayer violated securities laws on his initial purchase of stock to the detriment of his seller. The settlement payment made to the seller was held to be a capital expenditure because all the claims it settled arose from his acquisition of the stock. The investment in the present case was in inventory and not in the *319 stock which was sold and upon which the gain was realized. For defendant, the fact that the inventory purchase accomplished its intended purpose of increasing the portion of the gain that was contingent upon the results of an audit does not change the character of the transaction nor does it make the purchase and subsequent transfer of the inventory a part of the stock sale on which the gain was realized.
VI
In Anderson the issue before the court was in which year must funds held back from a sale of stock and placed in escrow be included as gain for tax purposes. As part of an agreement to sell stock, the sellers agreed to prosecute and carry to conclusion certain patent and mining claims. It was agreed that $500,000 of the purchase price would be held back and placed in escrow as security against breach of this agreement. In 1958, the purchaser claimed a breach of the agreement on the part of the sellers relating to undisclosed taxes, unmarketable titles and a failure on the part of the sellers to obtain certain patents. As a result only $259,704.13 was released from the fund to the sellers. The balance of the funds was held in the escrow account.
The IRS contended that the entire $500,000 was taxable to the sellers in 1956, the year of the agreement, as a long-term capital gain. The court held that the $500,000, set aside pursuant to the sale contract, was not includable in the sellers’ income in 1956, the year of the agreement, as a long-term capital gain. Id. at 702. The court’s reasoning was that until an actual distribution was made to the taxpayer, the taxpayer lacks ultimate control over the funds; the “control” being the ability to take the money at will. Absent control, “[t]he mere receipt of income from the fund was insufficient to bring the incidents of taxation to bear over the complete purchase price in the year of the sale.” Ibid.
Plaintiff argues that Anderson is analogous to the present case, because plaintiffs gain on the sale of the stock was reduced by the sum it had to spend in 1987 to purchase the inventory in order to insure that the performance guidelines for the corporation would *320 be met. The Division, however, argues that Anderson says nothing about whether a transaction designed to manipulate those performance goals is integral to and a part of the stock sale transaction.
Anderson is of no help to plaintiff as it simply stands for the proposition that purchase monies held in escrow, pending the happening of an event, and pursuant to a contract for the sale of property, are not taxable to the seller until the seller has the right to receive those monies.
However, the year in which the escrow monies should be taxed is not the issue in the present case. The issue is whether the fact that the inventory purchase had the effect of increasing the amount of the escrow funds to which the shareholders and plaintiff are entitled means that the subsequent return of the inventory to Lucas entitles plaintiff to include the purchase price in the pre-sale basis of its SE stock.
In Rev.Rul. 80-119, the taxpayer purchased stock from a seller who later brought an action against him in federal district court alleging violations of the Securities Exchange Act with regard to the stock purchase. The taxpayer settled the claim by paying the seller a sum of money.
The issue was whether the monies paid in settlement were deductible to the taxpayer as a business expense under I.R.C. § 162(a) or were non-deductible capital expenditures under I.R.C. § 263(a). In advising that the settlement payment was a capital expenditure, the amount of which increased the taxpayer’s basis in the subject stock, the IES applied the “origin-of-the-claim test.” The origin-of-the-claim test is a factual inquiry directed to the ascertainment of the kind of transaction out of which the litigation or threatened litigation arose. The “determination is made by examining each claim to discover if it originated in the course of the conduct of a trade or business as an ordinary and necessary business expense or if it originated in a transaction giving rise to a non-deductible expenditure, such as the acquisition of a capital asset.” Rev.Rul 80-119, 1980-1 C.B. 40. Having applied the origin-of-the-claim test, the IES determined that “[t]he entire *321 amount of the out-of-court settlement payment [was] a capital expenditure because all the claims it settled arose from the acquisition of a capital asset.” Ibid.
Plaintiff argues that applying the origin-of-the-claim test to the facts of the present case leads to the conclusion that plaintiffs share of the purchase price paid for the inventory was a capital expenditure, not currently deductible, and therefore includable in the pre-sale basis of plaintiffs SE stock. The Director, while not disputing that the payment for the inventory was a capital expenditure, argues that the purchase price is properly included in the cost basis of the inventory, not the stock; and, therefore, that Rev.Rul. 80-119 is inapposite to the extent it permits the taxpayer to increase the basis in his stock by the amount of the settlement payment.
Plaintiffs reliance on Rev.Rul. 80-119 is misplaced. In Rev. Rui. 80-119, the taxpayer purchased stock. In settlement of an ensuing dispute, the taxpayer made a cash payment to the seller. The purchase price of the stock was the taxpayer’s cost basis for the stock. As to the settlement payment, it too can be considered part of the purchase price of the stock because the litigation arose out of the stock purchase, and the settlement amount was the price paid by the taxpayer to conclude the sale with the seller once and for all.
The very point that the seller was making by threatening to bring suit was that he felt he had been underpaid by the taxpayer. The seller’s argument was that the taxpayer’s activities increased the value of his stock, and, had he known about those activities, he would have asked a higher price for his stock. Thus, including the settlement amount in the purchase price, and therefore, the taxpayer’s cost basis, is consistent with the legal dispute that gave rise to the eventual settlement.
Unlike Rev.Rul. 80-119, the inclusion of the settlement amount in plaintiffs presale basis is not consistent with the underlying facts of the case at bar. Lucas complained that they overpaid for the SE stock because the sale of the inventory had artificially increased SE’s net consolidated income. The thrust of this argu *322 ment was that Lucas wanted the cost of the inventory deducted from the calculation of the purchase price of the stock and the inventory returned. In other words, Lucas felt it had oveipaid for the stock. Thus, according to Rev.Rul. 80-119, it is Lucas, not plaintiff, who is to adjust its basis in the SE stock by virtue of the settlement agreement, because Lucas is reducing the amount it paid for the stock.
VII
There is no basis in law or in fact for plaintiffs position. The sale of plaintiffs stock occurred in 1986, and the price was fixed, subject to an amount being held in escrow pending a determination of future business activity. As quoted, the merger agreement provided that “the overriding principle and intention is that the adjusted consolidated income ... represents a true and fair result for the period under review____” To achieve this true and fair representation, SE agreed that it would not take any steps to inflate sales by any “means or device outside normal, historic business practice.”
In spite of the agreement, Stella Schaevitz, Howard Schaevitz, and Phyllis Howard purchased slow- and non-moving inventory in 1987, through a third party which they controlled, in an amount which triggered payment to all SE shareholders from the escrow fund, including plaintiff. The purchase was not in the ordinary and normal course of business.
These three individuals were volunteers who benefited themselves, as well as all the other SE stockholders, by triggering payment from the escrow fund. The voluntary activity of these individuals cannot be attributed to plaintiff on the evidence before the court. Plaintiff, a separate legal entity, did not participate in the purchase of the inventory; was not a party to that purchase; did not expend any funds in 1987; did not take title to the inventory; did not have possession of the inventory; never obtained a proprietary interest in the inventory; and did not enter into any agreement to participate in the purchase. There is simply no evidence before the court to indicate that the payment *323 by plaintiff to the shareholders was made under any legal obligation on the part of plaintiff.
Based on the merger agreement, plaintiff could never have been under any legal obligation to purchase inventory in order to inflate sales. In fact, the purchase of inventory constituted a breach of contract. Simply put, there was no legal relationship between plaintiff and the individual purchasers of the inventory which required plaintiff to pay for the inventory.
The incongruity of plaintiffs position is further emphasized by other circumstances. First, if there had been any obligation on plaintiffs part to participate in the purchase of the inventory, the shareholders would have had plaintiff pay its share of the purchase price at the time of the purchase and would not have advanced money for plaintiff. Secondly, part of the alleged increase in basis is attributable to legal fees incurred by the shareholders in defending themselves against Lucas’ claim that a fraud was perpetrated. Plaintiff did not participate in any such fraud. Third, the computation of the amount paid by plaintiff to the shareholders is unrelated to plaintiffs percentage of the total stock it owned in SE. If plaintiff did in fact have a legal obligation to make payment for the inventory, so did every other stockholder of SE. Yet, the three shareholders who purchased the inventory did not collect from any of the other stockholders for the amount paid for the purchase of the inventory. If the purchase of the inventory resulted in an increase in basis, it would have been an increase in basis for every one of the stockholders. Fourth, plaintiff did not participate in the return of the inventory to Lucas in 1989 and did not sign the bill of sale conveying the inventory to Lucas in 1989. To the contrary, when the inventory was returned to Lucas, Stella Schaevitz, Howard Schaevitz and Phyllis Howard warranted in the bill of sale that they were the only parties with an interest in the inventory.
I hold that plaintiffs payment to the three individuals did not constitute an increase in the basis of plaintiffs stock sold in 1986 and paid for partially in 1986 and partially in 1987. By 1987, plaintiff had received the entire amount to be realized from the *324 sale of its stock, including payment from the escrow fund, and its basis for that stock was fixed and concluded in 1986 in accordance with I.R.C. § 1001. Since plaintiff did not participate in the purchase of the inventory in 1987, and had no legal obligation to do so, there is no factual basis for a claim that the tax basis of plaintiffs stock increased in 1987 and that its gain on the payment for its stock from the escrow fund in 1987 should be reduced by any amount which the three individuals paid in purchasing the slow- and non-moving inventory. The purchase of the inventory in 1987 had no tax consequences for the plaintiff. The matter is disposed of accordingly, and the complaint is dismissed.
Further discussion, however, may be appropriate. Stella Sehae-vitz is one of plaintiffs two trustees. Her husband, A. Robert Schaevitz, is the other. Howard Schaevitz and Phyllis Howard are plaintiffs two beneficiaries. Plaintiffs trustees took funds from plaintiff only after Lucas discovered the purchase of the slow- and non-moving inventory by Stella Schaevitz, Howard Schaevitz and Phyllis Howard; believed that the purchase was a fraud; and threatened legal action.
In the absence of any legal obligation on the part of the trust to make any payments in connection with the purchase of the inventory, the funds paid by the trust, controlled by trustees, Stella Schaevitz and A. Robert Schaevitz, to Howard Schaevitz and Phyllis Howard, the beneficiaries of the trust, are distributions to them from the trust. The funds paid to Stella Schaevitz, one of the trustees and a shareholder, are at best a loan to her from the trust. There is no evidence that plaintiffs trustees intended that plaintiff, a separate entity, should participate in any way in the purchase of inventory in 1987. The payment by plaintiff was made 10 days after the claim by Lucas was settled. The transaction which is the subject of this litigation was a purchase of inventory by individual stockholders to increase the income of the surviving corporation in order to trigger payment for stock sold; and the shareholders took the inventory with a cost basis of $525,100.
*325 A transaction between a shareholder and a corporation whereby the shareholder transfers property to the corporation, and the shareholder’s basis in his stock is increased, results in a capital contribution. “It is settled that a shareholder’s voluntary contribution to the capital of [a] corporation has no immediate tax consequences. Instead a shareholder is entitled to increase the basis of his shares by the amount of his basis in the property transferred to the corporation.” C.I.R. v. Fink, 483 U.S. 89, 94, 107 S.Ct. 2729, 2732, 97 L.Ed.2d 74, 81-82 (1987) (citing I.R.C. § 263). (citations omitted) A capital contribution by definition requires an economic outlay. Estate of Leavitt v. C.I.R., 875 F.2d, 420, 422 (4th Cir.1989) cert. denied, 493 U.S. 958, 110 S.Ct. 376, 107 L.Ed.2d 361 (1989). There was also no capital contribution because the monies paid by the shareholders constituted a purchase of goods and materials, not an economic outlay to constitute an increase in basis in the corporate stock owned by the shareholders. The subsequent return of that inventory might have resulted in a loss in the year the property was returned, although that issue is not before the court.
Even if plaintiff were to be considered as legally responsible for participating in the purchase of the inventory, there was no explanation as to how a cost basis in the inventory is translated into a cost basis in stock some two years after the stock was sold and after the inventory was returned to Lucas. There is no authority in case law, the Internal Revenue Code or the regulations which provides that such a transaction results in an increase in the basis of the stock of SE owned by plaintiff.
On a sale of property, gain or loss is the difference realized by the taxpayer and his adjusted basis for the property. This fundamental principle embodied in § 1001(a) of the Internal Revenue Code, permits the taxpayer’s investment to be recovered tax free before he is charged with gaming on the sale; conversely, the transaction generates a loss if the amount is less than taxpayer’s investment.
[Boris I. Bittker & Martin J. McMahon, Jr., Federal Taxation of Individuals § 26.1 (1988).]
To determine gain or loss on the sale of property, “adjusted basis” is therefore dispositive. To determine adjusted basis, the original or unadjusted basis of the property must first be ascer *326 tained. Basis is cost in accordance with I.R.C. § 1012, subject to certain exceptions.
Since the stock’s “adjusted basis” is dispositive in determining gain by plaintiff on the sale of its stock, reference must be made to I.R.C. § 1016 to determine if the purchase of the inventory would be a proper adjustment to basis. Section 1016(a) sets forth the general rule for making proper adjustments “in respect of the property.” The section provides for twenty-three adjustments, none of which would allow an adjustment to basis for the purchase of inventory under the facts of this case.
The application of plaintiff for a refund is denied, and the complaint is dismissed. Judgment will be entered accordingly.

 One advantage of election out of the installment method, and taxation of the estimated total proceeds of the sale in 1986 was that under the Internal Revenue Code capital gains were taxed at lower rates in 1986 than they were in 1987 and years following. IRC § 1(h) as amended by P.L. 101-508.

 This court will not address that argument except to note that the 1989 inventory transfer was part of a negotiated settlement with Lucas. That is, Lucas dropped its legal claims partly as a result of the return of the slow- and non-moving inventory. Thus, the transfer may not have resulted in a loss under those circumstances. Cf. Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 130 Ct.Cl. 166 (Ct.Cl.1954) (values of two exchanged properties are either equal in fact or presumed to be equal); see also U.S. v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962).